UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
                                         :

CHELSEA HOTEL OWNER LLC, IRA     :
DRUKIER, RICHARD BORN, and SEAN   :
MACPHERSON,                            :     Civil Action No._____
                                           :
            Plaintiffs,                :     **COMPLAINT**
                                           :
     - against -                    :
                                           :     JURY TRIAL DEMANDED
CITY OF NEW YORK, NEW YORK CITY   :
DEPARTMENT OF HOUSING            :
PRESERVATION & DEVELOPMENT,     :
MARTHA ANN WEITHMAN, in her official  :
capacity as Assistant Commissioner of the New  :
York City Department of Housing Preservation &  :
Development, and NEW YORK CITY      :
DEPARTMENT OF BUILDINGS,        :
                                           :
           Defendants.            :
---------------------------------------------------------- X

       Plaintiffs Chelsea Hotel Owner LLC (the "Owner"), Ira Drukier, Richard Born, and Sean

MacPherson (collectively, "Plaintiffs"), for their complaint against defendants City of New York

(the "City"), the New York City Department of Housing Preservation & Development ("HPD"),

Martha Ann Weithman in her official capacity as Assistant Commissioner of HPD, and the New

York City Department of Buildings ("DOB") (the City, HPD, Weithman and DOB, collectively,

"Defendants") allege—on information and belief as to those allegations for which they do not have

personal knowledge—as follows:

**PRELIMINARY STATEMENT**

      1.      On November 14, 2018, more than six years into a massive redevelopment of the

Hotel Chelsea (the "Hotel")—which was fully permitted by DOB and repeatedly audited and

inspected by numerous City agencies—DOB stopped all work on the project. DOB stopped work

because HPD told DOB to reclassify the building as a single room occupancy multiple dwelling

("SROMD"), requiring the Owner to file for a Certificate of No Harassment or to prove—for a second time—that the building was not an SROMD.

2.      DOB and HPD, of course, were wrong.  In 1997, twenty-one years before the November 2018 stop work order, HPD had issued a permanent luxury exemption for the Hotel. Yet both agencies arbitrarily ignored HPD's prior decision; reversed the accurate and permanent classification of the building as "SRO Restricted: No" in DOB's Building Information System ("BIS System"); ignored the legal definition of SROMD in place at the time the permit was issued in 2012; and unilaterally countermanded, without any court oversight or due process, two Consent Decrees previously entered into by HPD in September 2013 and April 2016 expressly permitting the construction to proceed.

3.      The City's policy decisions, carried out by HPD and DOB, were arbitrary and irrational; wrongfully stopped work on the Hotel for more than two years, without basis; and thereby deprived the Hotel's Owner of its most basic due process rights.  HPD then compounded the damage done by prosecuting the Owners and its principals for harassment.  The deprivation of the Owner's constitutional due process rights, together with the public pursuit of the reputable hoteliers and developers who manage the Hotel, damaged the Owner and its principals; put its financing at risk; increased its costs; because its principals are personal guarantors, put their personal fortunes at risk; harmed the same principals' reputations; and caused them to forgo other business opportunities.  Together, the City's actions damaged the Owner and its principals in an amount not less than $100 million dollars.

***

4.      The Hotel Chelsea is a New York institution.  Built in the 1880s, it is a distinctive Victorian Gothic structure, with a red-brick facade and flower-ornamented iron balconies.



*The Hotel Chelsea.*
*Photograph courtesy of Wikimedia Commons,*
*(https://newyorkyimby.com/2016/11/new-owners-plan-hotel-condo-conversion-of-12-story-hotel-*
*chelsea-at-222-west-23rd-street-chelsea.html).*

Its manager from the 1960s to the late aughts, Stanley Bard, was described by THE NEW YORK TIMES in his obituary as "a Robin Hood of innkeepers who nurtured writers and artists and tolerated assorted deadbeats."   In 2007, Bard was ousted from management by his partners. Inexperienced with hotel management, those partners sold the Hotel to developers in 2011.

5.     By then, the Hotel required a major redevelopment.  Its physical plant had decayed to a point where it was sometimes difficult to imagine, much less see, its former glory.  The elevators of the twelve-story behemoth barely functioned, the paint peeled, the floors sagged, and behind the walls, the electrical, plumbing and heating systems were not only outdated, but also a byzantine mess after a lifetime of patchwork fixes.



*Units in the Hotel Chelsea prior to their renovation by the Owner.*
*Photographs courtesy of Hotel Chelsea management.*

6.     Updating the historic Hotel would have been a challenge under any circumstances, but that challenge was compounded by strong-willed, well-organized tenants.  Before the Owner bought the property in 2016, two prior developers—working from 2011-2016—failed, in part because they did not have established track records of maintaining constructive relationships with tenants while rehabilitating properties.  The present Owner, by contrast, is managed by some of

New York City's most reputable hoteliers.  Ira Drukier, Richard Born, and Sean MacPherson are experienced developers and hotel managers, who have executed careful, respectful renovations of some of downtown's most significant buildings, often while occupied by long-term tenants.  Their work includes The Bowery, The Marlton, The Jane, and The Maritime hotels.

7.      Consistent with their track record, after the Owner took over, relations with the vast majority of the Hotel's tenants improved considerably.  Mr. Drukier and Mr. MacPherson worked from the Hotel each day, where they forged personal relationships with tenants and worked to ensure that complications arising from construction were mitigated or quickly ameliorated.  The Owner honored a 35% rent abatement for construction-related inconvenience for tenants that had been negotiated and documented in 2013 and 2016, respectively.  Those rent abatements were the product of two so-ordered consent decrees (the "Consent Decrees") that settled a litigation among the Hotel's Tenant Association ("Tenant Association"), the prior owner/developer, Chelsea Dynasty, and HPD.  The Consent Decrees, executed by the office of the head of HPD's litigation unit, Debbie Rand, explicitly acknowledged and approved the construction at the Hotel.  The Consent Decrees were entered in court in September 2013 and April 2016, respectively.

8.      With the support of the majority of tenants, the Owners undertook major development work, including upgrading all major systems in the Hotel, updating the main lobby, renovating occupied tenant apartments and completing interior work on many of the 125 new hotel rooms being built into the open space left by the prior owner's demolition work.





*Newly renovated units in the Hotel Chelsea.*
*Photographs courtesy of Hotel Chelsea management.*




*Newly renovated Hotel Chelsea lobby.*
*Photographs courtesy of Hotel Chelsea management.*

9.     Notwithstanding the positive management change and generous rent abatement, a very small, but highly disgruntled, group of tenants spent countless hours doing everything possible to stop the redevelopment.  They called 311 day and night to report the slightest perceived problem.  As a result, City agency inspectors passed in and out of the Hotel almost daily,

sometimes issuing violations, other times leaving voicemail messages confirming that the Owner's crews were trying very hard and that the site was one of the cleanest in the City.

10.     Nothing deterred this small contingent of tenants, in particular Jonathan and Susan Berg and Debbie Martin, whose lawyers promised them a massive, "life-changing" payday from the Owner, if they could find a hook to stop construction.  It was in this context that they decided, in 2018, to advance the false contention that construction could not continue without a Certificate of No Harassment.

11.     The Certificate of No Harassment regime is designed to protect tenants from abusive landlords, who might cut off essential services like heat or water, or otherwise threaten tenants, with the intention of getting them to vacate their units.  Under the law, if a building meets the definition of a single room occupancy multiple dwelling, or SROMD, its owners must apply to HPD for a Certificate of No Harassment before getting a permit from DOB to move kitchens or bathrooms.  HPD decides whether to issue a Certificate of No Harassment after investigating if the owner has harassed its tenants.

12.     SROMD was defined in the early 1980s as part of the Certificate of No Harassment legislation designed to preserve efficiency units, typically without a kitchen and often with a shared bathroom—"SROs" in the common parlance—that often house the poorest and most vulnerable New Yorkers.  Although the definition has shifted over time, it always encompassed the idea that certain buildings with "Class B" units, or transient hotel rooms, could be SROMDs under some circumstances.  The definition, however, always explicitly excluded "luxury hotels," defined as buildings where the majority of rooms rented for amounts over certain dollar thresholds in May of 1983.

13.     Jonathan and Susan Berg and Debbie Martin knew their assertion that a Certificate of No Harassment was needed for construction had no merit, having been specifically told years

earlier by DOB that the Hotel was not an SROMD.  In fact, the Bergs had personally benefited

from the Hotel's luxury exemption.  The Hotel's designation was changed in 1997 when the then-

owner secured a "luxury exemption" for the Hotel precisely so that the Bergs could expand their

luxury penthouse on the roof.

14.     Nevertheless, the Bergs and Martin decided to have Debbie Martin, who lives in

one of two SRO units in the Hotel, write HPD to "innocently" inquire why a Certificate of No

Harassment was not required given that the Owner was "demolishing" her hallway bathroom (the

Owner had already built a new bathroom equally close to her apartment, a fact she omitted from

her correspondence).  In response, the new head of litigation at HPD, defendant Martha Ann

Weithman, procured a change in the "SRO" status of the Hotel at DOB from "SRO: No" to "SRO

Yes."  In executing this policy decision, she failed to consider the applicable definition of SROMD

in place when the permit was issued in 2012, ignored that her own agency had already exempted

the Hotel from the Certificate of No Harassment requirement, and ignored that her immediate

predecessor, Debbie Rand, had approved and her office had executed the Consent Decrees, which

expressly contemplated and set agreed-upon conditions for the redevelopment.

15.     As HPD's policymakers fully understood, a change in DOB's system would stop

the construction in its tracks, and obligate the Hotel's Owner to apply for a Certificate of No

Harassment (unless it happened to have 30-year-old rent records sufficient to establish the Hotel

was exempt from the requirement).  HPD's policymakers also fully planned to, and then did, deny

the Certificate of No Harassment application they intentionally induced—after a corrupt, "show"

investigation engineered by HPD's litigation unit.  To control the direction of the investigation,

HPD ensured that the Hotel Chelsea case—the most complicated on its docket—was assigned to

one of the Certificate of No Harassment unit's least experienced investigators and then tipped off

Debbie Martin and Susan and Jonathan Berg about the date of his inspection, so they would be

prepared to pour out their contrived grievances when the junior inspector came to take tenant statements.

16.     HPD no doubt believed that the Owner would capitulate after HPD reached its "initial determination" that the Owner harassed tenants and settle or that HPD could easily win its claim in an administrative forum where HPD litigators frequently appear, under a law that favors tenants.  The result would be that the Owner could not even re-apply for a Certificate of No Harassment for three years, and in the meantime, the redevelopment and the Owner would be stuck in limbo, with a half-done, largely un-useable building.  For the new guard at HPD, they no doubt believed this would send a strong pro-tenant message to landlords throughout the City.

17.     In the summer of 2018, when approached by Debbie Martin, HPD was fully aware that the Hotel Chelsea's designation in DOB's BIS system was "SRO: No."  The DOB BIS system was populated with a list from HPD of all SROMDs in the City.  As owners seeking building permits prove their buildings are not SROMDs, DOB changes the designation of the building in the system.  Thus, the BIS System is the place where luxury exemptions are tracked.

18.     Yet, instead of honoring that designation, HPD officials "coyly" inquired if DOB could prove it was correct, because HPD's "records" reflected 189 "B units," the definition of SROMD in 2018, but not the definition in place when the permit at issue was obtained in 2012.  HPD's assertion was factually wrong (as the Hotel had been exempted in 1997).  Moreover, HPD's contention that the Hotel had 189 B units demonstrates that it was applying the wrong definition of SROMD (the one in place in 2018, not the one in place in 2012 when the permit was issued).  Under the applicable definition, even if the Hotel did not have a luxury exemption, which of course it did, it still was not an SROMD if fewer than nine units were used for single room occupancy.  HPD intentionally, as a matter of policy, elected not to apply the relevant definition and therefore made no effort to assess the number of SRO units occupied for that purpose in 2012.  Despite the

fact that HPD offered no proof that DOB's classification of the Hotel was wrong, DOB deferred to HPD's policy judgment, changed the Hotel's SROMD designation, stopped the work, and threatened to permanently revoke the Hotel's permit unless the Hotel's Owner applied for a Certificate of No Harassment or otherwise immediately produced 30-year-old evidence that it did not need one.

19.     The rest is history.  Every effort by the Owner to resolve the matter consensually with DOB and HPD, or even to understand how the building had come to be reclassified in 2018, six years after DOB had issued the building permit in 2012, pursuant to a much-scrutinized, year-long plan examination process, was met with a stone wall.  The Owner had no choice but to file for a Certificate of No Harassment—in which it explicitly explained that it believed the Hotel was luxury exempt but, as a predecessor-in-interest, had no records—and to proceed to an agency trial about whether it had "harassed" its tenants.

20.     The trial dragged on for nine months.  HPD litigators called inherently incredible tenant witnesses (although not before those witnesses attempted to extort $47 million from the Owner in exchange for not testifying), and used scorched-earth litigation tactics to bog things down and avoid the issue of how it was possible that every City agency, including HPD, was aware of the construction since 2012, yet no one had thought to demand a Certificate of No Harassment until 2018.  Indeed, HPD fought—and succeeded for many months—to avoid turning over the emails that would show how it was that Ms. Martin got the attention of HPD, and HPD, in turn, leaned on DOB to change the status of the building in 2018.

21.     It was the production of these documents late in 2020—six months into the agency trial—that caused the administrative law judge to finally accede to the Owner's repeated requests that it be permitted to put on evidence to show that HPD could not prove that the Hotel was an SROMD under the definition applicable when the permit was issued.  The judge officially relented

to this line of inquiry in late 2020.  In preparing its expert to testify on this subject on the next day of trial, January 4, 2021, the Owner stumbled upon the file for the Berg's 1997 apartment renovation in DOB's microfiche and found, therein, HPD's order/decree confirming the Hotel's luxury exemption, rendering it, officially, not an SROMD.

22.     Upon being confronted by the certified exemption (from its own files) on December 30, 2020, DOB was willing to constructively engage with the Owner for the first time in more than two years.  Six days later, HPD withdrew its case, contending, effectively, that it had no way of knowing it had previously granted a luxury exemption.  Two days after that, DOB lifted the stop work order, restored the permit and, with it, the Owner's right to complete the redevelopment.

23.     While being proven right is satisfying, the Owner ought never to have been required to reprove its "classification," which had been modified to "SRO: NO" by a prior HPD regime and was correct in the City's official records.  The new HPD regime arbitrarily and capriciously procured a change to the City's official records without basis.  The chain of events set off by that policy decision, and DOB's follow-on decisions to stop work on the project, and refuse to even engage with the Owner about the Hotel's reclassification, not only deprived the Owner of its due process rights, but delayed for over two years one of the City's most important development projects.  The City's conduct has immiserated the residents of the Hotel Chelsea, its employees, the Owner, its principals, and the broader Chelsea community.

24.     The Owner and its principals are entitled to damages for the manifest deprivation of their rights by the City and its policymakers under § 1983.

## **PARTIES**

25.     Plaintiff Owner is a Delaware limited liability company registered to do business in New York, with a principal place of business in New York, New York.

26.     Plaintiff Ira Drukier is an individual who resides in New York, New York.

27.     Plaintiff Richard Born is an individual who resides in New York, New York.

28.     Plaintiff Sean MacPherson is an individual who resides in New York, New York.

29.     Defendant City is a municipal corporation.  HPD and DOB are agents of the City.

30.     Defendant HPD is an agent of the City.

31.     Defendant Martha Ann Weithman is an individual who resides in New York, New York.  Ms. Weithman, as the Assistant Commissioner of HPD, is an agent of the City as well as an employee of the City who has "substantial policy discretion."

32.     Defendant DOB is an agent of the City.

## JURISDICTION AND VENUE

33.     This Court has original jurisdiction over this action under 28 U.S.C. § 1331.

34.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## FACTS

### I.     A Brief History Of The Hotel Chelsea.

35.     The Hotel Chelsea is among the most iconic New York buildings.  A designated New York City landmark since 1966, it was added to the National Register of Historic Places in 1977.  The Hotel was designed by Philip Hubert, a founding member of the architectural firm Hubert & Pirsson.  Hubert & Pirsson was active in the late 1880s and is responsible for many of New York City's "Gilded Age" buildings, including the landmarked 146-156 East 89th Street House, the Navarro Flats, and numerous cooperative apartment buildings.

36.     In addition to incorporating innovative concepts into their apartment plans that provided a greater degree of light and air than other buildings of that time, Hubert & Pirsson were actively involved in encouraging the growth of cooperative ownership of apartments.  Now commonplace, the concept of pooling resources to own and manage a shared multiple dwelling

was novel when proposed by Hubert.  The Hotel Chelsea, completed in the early 1880's, was one of the first cooperative apartment houses in New York City.

37.     Upon opening in 1884, the Hotel functioned as a co-op, a hotel renting rooms on a daily basis, and an apartment house renting both rooms and residential apartments with kitchens and bathrooms on a monthly basis.  After a brief closure, it re-opened as a luxury hotel in 1905.

38.     In or around 1939, the Hotel was purchased by the Bard, Elder, and Krauss families. Thereafter, in or about the 1960s, Stanley Bard assumed management responsibility for the Hotel—a role he maintained until his ouster in 1997, when Bard lost control of the property to his partners.

39.      By the time Bard took charge of the Hotel, it was already a well-known haunt for an artistic clientele.  Mark Twain was rumored to be an early guest, followed by a succession of poets, painters, musicians, photographers, and writers, including Sherwood Anderson, Jack Kerouac, William Burroughs, and Thomas Wolfe.  In the 1950s, poet Dylan Thomas reputedly slipped into a fatal coma at the Hotel after, as legend has it, declaring "I've had eighteen straight whiskies – I think that's a record."

40.     Notwithstanding its already storied history, Bard presided over the Hotel's most chaotic and infamous decades.  One resident described it as "a place where, because of Stanley, you could do virtually anything short of murder, though that took place too.  There used to be a murder, a suicide, and a fire every year."[1]  One night Edie Sedgwick accidentally set her room on fire after falling asleep with candles burning.  The Hotel's most notorious story was the death of Nancy Spungen, who was stabbed to death in room 11, allegedly by her boyfriend, Sid Vicious of the Sex Pistols, who himself died of a drug overdose before he could stand trial for the murder.

---

[1] Nathaniel Rich, *Where the Walls Still Talk*, VANITY FAIR (Oct. 8, 2013), available at
https://www.vanityfair.com/culture/2013/10/chelsea-hotel-oral-history.

41.     During the period between 1960 and 1997, Bard operated the Hotel as an apartment/hotel.  Transient guests would come and go, paying for their rooms at a nightly rate, while others were offered longer term leases for large, medium or small units, some with no kitchens and shared bathrooms.  All long-term tenancies were at Stanley Bard's discretion.  Bard acted as a gate keeper during his tenure, selectively determining who could rent on a non-transient basis in order to maintain his idea of the artistic integrity of the Hotel community.  The "scarcity" Bard's selectivity artificially created also allowed him to charge luxury prices for hotel rooms and residential units in the increasingly dilapidated Hotel.  Over the years, would-be tenants sought to "bribe," "flatter" or "paint" their way into highly sought-after permanent residency, sometimes by renting a room on a nightly basis and simply refusing to leave.[2]

42.     The careful attention Bard paid to the profile of Hotel tenants did not extend to his maintenance of the building itself.  As a tenant—writing about the Hotel during the latter part of Bard's time at the helm—described:

> The hallways of the Chelsea were dimly lit by fluorescent tubes, the linoleum in the corridors was worn, the plaster of the walls cracked, the paint peeling, and exposed wires and pipes jutted out from the ceiling . . . . The cheap hotel furniture hadn't been replaced since at least the sixties and was rotting and falling apart.  The carpets were stained and dirty.  Some rooms were better than others, but they were all infested with roaches and mice . . . if you used your imagination, you could see the lingering traces of the grand hotel.  The layers of peeling paint hid the fancy woodwork, and here and there a stained glass transom had survived.[3]

43.     When Stanley Bard's partners seized control, the Hotel was dilapidated after years of neglect.  Moreover, with Stanley went decades of institutional knowledge about the building and its residents.  In the midst of a legal battle with Krauss and Elder for control of the Hotel, Bard

---

[2] Ed Hamilton, *Legends of the Chelsea Hotel: Living with Artists and Outlaws in New York's Rebel Mecca* (2007).

[3] *Id.*

left the records of the Hotel in disarray.  New management was left to untangle decades of ad hoc

tenant renovations that combined units and annexed common areas, and bare-minimum patch work

repairs to every major building system.

44.     With those major building systems—heating, plumbing, electricity, fire safety, and

elevators—all on the brink, Krauss and Elder decided to dispose of the asset.  By the middle of

2011, Krauss and Elder closed on the sale of the Hotel to Chelsea Dynasty, LLC ("Chelsea

Dynasty"), managed first by Joseph Chetrit and then Ed Sheetz.  The Owner purchased the building

from Chelsea Dynasty in 2016.[4]  Each of these subsequent owner/developers worked to redevelop

and modernize the Hotel pursuant to a permit validly obtained in or about November of 2012 (the

"Redevelopment").

45.     For perspective, the Hotel Chelsea is enormous—spanning almost a full City block

between Seventh and Eighth avenues in Chelsea—the Hotel has 11 floors, as well as a cellar and

a multi-level roof, making any top-to-bottom overhaul a major endeavor.  The lot for the building,

as described on the deed, runs 175 feet east to west, and 98 feet 9 inches north to south.  The

Certificate of Occupancy provides for 83 apartments, 4 "half" apartments, and 180 hotel rooms,

as well as commercial units, doctors' offices and club rooms.

46.     Although the Redevelopment plan was modified a number of times over the course

of 2012-2018, each iteration was more or less consistent in a number of respects.  All versions of

the planned Redevelopment maintained the occupied residential apartments and planned to, while

working around those occupied units, upgrade every major system of the hotel, utilize some unused

aspects of the roof for new mechanical equipment and other unused roof space for common and/or

---

[4]  Chelsea Dynasty owned the Hotel from August 2011-November 2016.  The Owner closed the transaction
purchasing the Hotel in November 2016, but certain of the Owner's principals, Drukier, Born and MacPherson,
took over day-to-day operations in addition to the Redevelopment effort in or about March 2016.

commercial space, demolish the aging, unoccupied, transient Hotel rooms and apartments, and then reconfigure the vacant space left by the demolition into new transient hotel rooms and apartments.

47.     As set forth below, Defendants' policies stopped work on the Hotel's Redevelopment in November of 2018 on the grounds that a Certificate of No Harassment was required for construction.  At the time HPD and DOB acted together to stop the work, it was fully permitted and had been underway for almost six years.  Work on the Redevelopment was stopped from November 2018 until January of 2021 on this basis.  As explained in the next section, no Certificate of No Harassment was required at the time the policy decision to change the building's "SRO designation" was made in the summer of 2018—a fact that HPD and DOB now fully concede.

## II.     The Hotel Chelsea Was Not An SROMD And Did Not Require A Certificate Of No Harassment.

### A.     The Certificate Of No Harassment Regime.

48.     Single room occupancy units, or SROs, colloquially, are units with one or two rooms without a bathroom or kitchen.  SRO tenants typically share a common bathroom.  The Hotel presently contains only two such units, one on the eighth floor, occupied by Debbie Martin and Ed Hamilton, and another on the tenth floor, rented to Drew Straub.  Each SRO unit at the Hotel has access to a community bathroom on the same floor as the unit.

49.     Although shared living units are as "old as New York City itself," SRO housing "exploded" during the Great Depression and WWII era.[5]  In subsequent decades, housing reformers, who viewed SROs as substandard housing, unacceptable for a modern society, sought

---

[5] Brian J. Sullivan and Jonathan Burke, *Single-Room Occupancy Housing in New York City: the Origins and Dimensions of a Crisis*, 17 CUNY L. Rev. 901 (2014).

to discourage SRO housing and incentivize converting SROs to full apartments. In that context, the City banned the construction of new SROs in its City Charter enacted in 1954. Local Law 24 of 1954; NYC Ad. Code §§ 27-2077, 27-2078.

50.     The view of SROs changed yet again in the 1980s, as homeless advocates increasingly viewed SROs as housing of last resort for the City's poorest and most vulnerable residents. In order to preserve these "housing resources" and protect the "generally poor and elderly" tenants in SROs from landlords seeking to profit from removing them by failing to maintain the building or shutting off essential services, the Certificate of No Harassment regime at issue in this case was enacted through Local Law 19 of 1983.[6]

51.     The Certificate of No Harassment regime prohibits an owner from making certain types of alterations to an SROMD without first applying for and receiving a Certificate of No Harassment, a certificate that there has been no harassment of occupants during the preceding three years. "Harassment" is defined as conduct intended to cause a tenant to vacate their unit, such as intimidating tenants with the use or threatened use of force, cutting off essential services like water or heat, or locking a tenant out of their unit.

52.     The types of alterations to an SROMD that fall within an "Alteration 1" or "Alt-1" permit require a Certificate of No Harassment—and typically include, among other things, relocating kitchens and bathrooms. Under the Certificate of No Harassment regime, the owner of an SROMD who is planning Alt-1 construction submits a Certificate of No Harassment application. HPD conducts an inquiry and, if it determines there is reasonable cause to believe harassment occurred, presents its case at a trial before an administrative law judge. The administrative law judge then issues a report and recommendation, and HPD renders the ultimate

---

[6] Local Law 19 of 1983, Section 1.

determination.  If the HPD commissioner denies the Certificate of No Harassment, the applicant is barred from re-applying for 3 years.

53.    Alternatively, if a building has been designated as an SROMD and the building does not, in fact, meet the definition of an SROMD, the owner can apply to HPD for an exemption from the Certificate of No Harassment requirements, allowing the owner to pursue an Alt-1 permit without the need for a Certificate of No Harassment.

54.    Although the Hotel contains SROs, that does not necessarily mean it is an SROMD—as defined by the NYC Administrative Code—subject to the Certificate of No Harassment regime.  The definition has been subject to a number of amendments, including in 2014, years after the first permit was granted for the Redevelopment of the Hotel.  The definition, however, always included a "class B multiple dwelling"—class B referring generally to rooms for transient occupancy like hotel rooms—provided that the building does not fall within a number of exceptions.  One exception in the definition prior to 2014 generally excluded buildings with fewer than nine "class B" units "used for single room occupancy."  After the law changed in 2014, any building that *contains* more than nine "class B" units technically meets the definition of an SROMD.  The law is currently being revised to reflect the understanding that the 2014 definition is overly broad, by sweeping into its ambit many buildings, especially hotels, throughout the City which were never intended to be governed by the law (for example luxury hotels built after 1983, which of course have no records of their rents in 1983 to prove they are luxury exempt).[7]

55.    Another exception in the definition—which existed from the inception of the law in 1983 and is still in effect today—explicitly excludes "luxury hotels" from qualifying as

---

[7] Int. No. 2261-2021, available at
https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4920277&GUID=1F552D69-C99A-43D2-8203-EEB95C66203A&Options=ID%7cText%7c&Search=2261.

SROMDs.  In enacting the local law, the City Council specifically delegated crafting the definition of a "luxury exempt" hotel to HPD.  HPD's rules establish a "luxury hotel" as one where the rent in effect for 75% or more of the units on ***May 5, 1983*** exceeded certain dollar thresholds.  Any building that exceeded the thresholds is not a SROMD, and therefore not subject to the Certificate of No Harassment regime.

### B.      HPD Granted The Hotel Chelsea A Luxury Exemption In 1997.

56.      In or about 1996, Jonathan and Susan Berg, tenants in unit 1028, signed a long-term lease with Stanley Bard.  Then, with his express permission and assistance, they sought to overhaul and expand their rented penthouse apartment.  The architect for the project, Bennett Frandkin, was retained and paid for by the Bergs.  DOB initially denied the permit until the Bergs could resolve, among other things, the Hotel's obligation to obtain a Certificate of No Harassment. In lieu of a Certificate of No Harassment, David Bard, Stanley's son, acting for the benefit of the Bergs and on behalf of the Hotel, applied for an exemption from the Certificate of No Harassment requirement.

57.      On June 6, 1997, HPD issued a determination that "the applicant is en[titled] to an exemption from Local Law 19 of 1983 pursuant to Section 27-198a.(3) of the Administrative Code and the exemption is hereby granted" (the "Luxury Exemption").  Section 27-198a.(3) of the Administrative Code, currently codified at Section 28-107.2, is the luxury hotel exemption.  The Bergs were granted their permit soon thereafter.

**DEPARTMENT OF HOUSING PRESERVATION
AND DEVELOPMENT OF THE CITY OF NEW YORK**

Determination upon Application for a
Certification of No Harassment, Waiver and/or Exemption

_____

Application for Certification of No Harassment __ Waiver __ Exemption  X

Applicant :        David Bard

Premises:        222 West 23 Street, New York, NY

Application No.:    53/97

_____

Stephen Tinnermon, Acting Deputy Commissioner of the Office of

Housing Preservation, with respect to this application for a Certification, Waiver

and/or exemption determines that based upon the information received by the

Department of Housing Preservation and Development, the applicant is e

to an exemption from Local Law 19 of 1983  pursuant to Section 27-198a.(3) of

the Administrative Code and the exemption is hereby granted.

New York, New York
6\16 , 1997                                    _____
                                                            Stephen Tinnermon

*HPD's June 16, 1997 determination that the Hotel Chelsea is entitled to a luxury exemption.*

58.     Luxury hotel status, pursuant to HPD's rules, is based on a static, immutable set of

criteria, which, once established and proven, ***does not change*** – the rents that were in effect on

May 5, 1983.  It is an objective, factual test that considers conditions on that statutorily dictated

date.  Thus, the exemption is ***permanent and is not time limited***.

59.     Moreover, under the Rules of the City of New York, an exemption is only subject

to such period or other condition "stated in such . . . exemption."  Reflecting that the Hotel's luxury

exemption is a permanent bar to requiring a Certificate of No Harassment, the Luxury Exemption

does not state any time limitation.

60. As a matter of policy and practice, DOB tracks a building's "SROMD" status in its Building Information System or "BIS system," which has a public facing interface available on DOB's website. Specifically, the BIS system contains an entry called "SRO Restricted" that is marked "Yes" or "No" for each building.

61. After the Certificate of No Harassment regime was enacted in 1983, HPD compiled a list of buildings that it determined were SRO-restricted in accordance with the new law and conveyed that list to DOB. Given that the Bergs were obligated to secure an exemption in 1997, it stands to reason that the Hotel Chelsea was on this list initially conveyed to DOB by HPD.

62. By 1989, this list was uploaded on a DOB BIS mainframe and tracked electronically. The BIS system later became available to the public through DOB's website. To the extent that a building initially included on HPD's list later established that it was not an SRO-restricted building, DOB's policy was to change the information in the BIS system from SRO Restricted "Yes" to "No."

63. At some point after the 1997 Luxury Exemption was recognized for the Hotel, the building's status on the BIS system was changed from SRO Restricted "Yes" to SRO Restricted "No." The designation of "SRO Restricted: No" reflected the accurate status of the building. This was the status of the Hotel in DOB's BIS system in the summer of 2018.

NYC Department of Buildings
**Property Profile Overview**

| | | | | | | |
|---|---|---|---|---|---|---|
| **216 WEST 23 STREET** | | | **MANHATTAN  10011** | | **BIN# 1014130** | |
| WEST 23 STREET | 216 - 234 | | Health Area | : 5200 | Tax Block | : 772 |
| | | | Census Tract | : 91 | Tax Lot | : 64 |
| | | | Community Board | : 104 | Condo | : NO |
| | | | Buildings on Lot | : 1 | Vacant | : NO |

View DCP Addresses...    Browse Block

View Zoning Documents    View Challenge Results    Pre - BIS PA    View Certificates of Occupancy

| | | | |
|---|---|---|---|
| Cross Street(s): | 7 AVENUE,  8 AVENUE | | |
| DOB Special Place Name: | | | |
| DOB Building Remarks: | | | |
| Landmark Status: | L - LANDMARK | Special Status: | N/A |
| Local Law: | YES | Loft Law: | NO |
| SRO Restricted: | NO | TA Restricted: | NO |
| UB Restricted: | NO | | |
| Environmental Restrictions: | N/A | Grandfathered Sign: | NO |
| Legal Adult Use: | NO | City Owned: | NO |
| LL 158/17 Pro Cert Restriction until: | N/A | | |
| Additional BINs for Building: | NONE | | |
| HPD Multiple Dwelling: | Yes | | |

*The current Property Profile Overview from the DOB BIS system, listing the Hotel Chelsea as SRO Restricted: NO.*

### C.    <u>HPD Twice Expressly Assented To The Redevelopment.</u>

64.    As set forth in more detail below, once Chelsea Dynasty started the Redevelopment work, HPD twice expressly assented to and encouraged the Redevelopment through the Consent Decrees that included Debbie Rand, HPD's Assistant Commissioner for Litigation until 2017, Defendant Martha Ann Weithman's immediate predecessor in that role.[8]

65.    More specifically, in or about 2011, Hotel tenants sued Chelsea Dynasty, the Owner's predecessor, and HPD seeking concessions related to the Redevelopment work.  *See Childs v. Chelsea Dynasty LLC*, Index No. HP 6219/11 (Civ. Ct., N.Y. Cty.).  In that proceeding, HPD, a respondent, signed onto a lengthy settlement agreement that expressly contemplated that major construction work would continue at the Hotel while tenants lived there.  The settlement

---

[8]  Ms. Rand, and subsequently Ms. Weithman, appear on the City's list of employees with policy making discretion. https://www1.nyc.gov/site/coib/public-documents/policymaker-lists.page

agreement was so-ordered by the presiding Court in or about September 2013 and was executed by Debbie Rand's office (the "First Consent Decree").

66.     The First Consent Decree stated in pertinent part:

> 5.   The parties agree that the best way to expeditiously and properly perform the work of removing violations and upgrading systems at the building is for groups of Petitioners in Group 1 and Group 2 to temporarily relocate from their apartments to either a location outside the hotel while the work is done (the King and Grove New York Hotel at 29 E. 29 St., New York, NY), or to other apartments within the Chelsea.

> 148.   Petitioners will provide access for the work to be performed in this agreement, and also provide access for HPD inspectors to inspect apartments after repair work to remove violations has been done, provided that such access is arranged through the parties' attorneys and Zoe Pappas, and the parties will use their best efforts to cooperate on access issues.  The

*Excerpts from the First Consent Decree so-ordered on Sept. 27, 2013 in*
*Childs v. Chelsea Dynasty LLC, Index No. HP 6219/11 (Civ. Ct., N.Y. Cty.).*

67.     In addition, for the inconvenience of ongoing construction arising from the Redevelopment, the tenants who signed the agreement received a 20% rent abatement:

be shut off during this work; and 4) the beginning and ending time of the services shut off. Due
to the extensive disruption caused by the ongoing construction, the parties agree that
Respondents will give Petitioners a 20% rent reduction from November, 2013 until such time as
all construction is finished on a tenant's particular floor and in public areas of the hotel that
impact on the tenant. The parties agree that this 20% rent abatement is a compensation for
anticipated service disruptions caused by the ongoing renovations at the building. However, in
the event of a severe service disruption, such as extensive periods of lack of heat, hot water,
water, electricity or elevator service, or a major flood such as that which occurred on September
12, 2013, the parties agree that they will immediately negotiate in good faith to determine
whether the 20% rent abatement is adequate, and if the parties cannot resolve any such dispute,
the parties agree that this case can be restored to the court's calendar on 5 days' notice for a court
determination on the appropriate amount of an additional abatement, if any. In addition,

*Excerpt from the First Consent Decree so-ordered on Sept. 27, 2013 in
Childs v. Chelsea Dynasty LLC, Index No. HP 6219/11 (Civ. Ct., N.Y. Cty.).*

68.    In 2016, HPD, through Debbie Rand's office, executed a second stipulation
expressly acknowledging the ongoing construction and increasing the rent abatement for the
tenants to 35% in light of the long duration of the Redevelopment work. The second consent order
was also so-ordered by the presiding court in or about April 2016 (the "Second Consent Decree")

69.     The Second Consent Decree reiterates that:

> 2.  This 15% rent abatement is in addition to the 20% rent reduction the landlord has provided to the tenants commencing in November 2013 pursuant to the terms of the Contempt Consent Order and Settlement dated September 27, 2013. The parties agree that these rent abatements fully compensate the tenants for breaches of warranty that have occurred prior to the date of this stipulation and for the ongoing construction at the premises. However, this abatement does not include prolonged cut offs of electricity, internet service, water, heat, elevator or other basic services, or complications from landlord's contemplated work, including but not limited to pipes bursting, ceiling collapses or similar occurrences. In this agreement tenants reserve their rights to assert claims for breach of warranty or other claims if such conditions develop at the building.

*Excerpt from the Second Consent Decree so-ordered in Apr. 2016 in Childs v. Chelsea Dynasty LLC, Index No. HP 6219/11 (Civ. Ct., N.Y. Cty.).*

## III.     **The Hotel Properly Received An Alt-1 Permit Without A Certificate Of No Harassment.**

### A.     **DOB Reviewed Chelsea Dynasty's Permit Application Thoroughly.**

70.     After Chelsea Dynasty purchased the Hotel in 2011, it applied for an Alt-1 permit for the Redevelopment through its architect, Eugene Kaufman.

71.     DOB issues permits through two processes. One is a self-certification process, where the architect certifies to DOB that the plan meets DOB's requirements and DOB issues the permit based on the architect's word. By contrast, in a plan examination process, the architect submits the plans for DOB to review for compliance with all of DOB's specifications. In a plan examination, a permit is only issued after a thorough agency review, typically four to seven months, wherein DOB considers the details of the plans, and comments are traded back and forth between DOB and the architect of record to methodically resolve any issues.

72.     Chelsea Dynasty pursued its permit through the more rigorous plan examination process.  As public records demonstrate, the plan examination for the Redevelopment went on for more than a year and involved ten rounds of objections and responses.  DOB ultimately approved the permit for the Redevelopment (Job Number 120853754, the "Permit") on November 7, 2012, and issued the Permit the following month.

**NYC Department of Buildings**
**Plan Examination Overview for Job #:120853754**

Page: 1

Premises: 216 WEST 23 STREET MANHATTAN
BIN: 1014130   Block: 772   Lot: 64

Job No: 120853754
Job Type: A1 - ALTERATION TYPE 1

| DOC NUM | WORK TYPE | EXAM TYPE | EXAM DATE | EXAMINED BY | RESULT |
|---|---|---|---|---|---|
| 01 | A1 | FIRST | 11/09/2011 | KFL KENNETH FLADEN..ASST PLAN EXAM | DISAPPROVED |
| | | RE-EXAM | 11/16/2011 | KFL KENNETH FLADEN..ASST PLAN EXAM | DISAPPROVED |
| | | RE-EXAM | 04/16/2012 | DJI DAVID JIMENEZ..MAN PLAN EXAM | DISAPPROVED |
| | | RE-EXAM | 04/25/2012 | DJI DAVID JIMENEZ..MAN PLAN EXAM | DISAPPROVED |
| | | RE-EXAM | 05/03/2012 | DJI DAVID JIMENEZ..MAN PLAN EXAM | DISAPPROVED |
| | | RE-EXAM | 05/10/2012 | DJI DAVID JIMENEZ..MAN PLAN EXAM | DISAPPROVED |
| | | RE-EXAM | 06/05/2012 | DJI DAVID JIMENEZ..MAN PLAN EXAM | DISAPPROVED |
| | | RE-EXAM | 08/07/2012 | DJI DAVID JIMENEZ..MAN PLAN EXAM | DISAPPROVED |
| | | RE-EXAM | 10/26/2012 | DJI DAVID JIMENEZ..MAN PLAN EXAM | DISAPPROVED |
| | | RE-EXAM | 11/07/2012 | DJI DAVID JIMENEZ..MAN PLAN EXAM | APPROVED |

*The Plan Examination Overview from the DOB BIS system.*

Thereafter, the Permit was renewed by DOB annually, and was audited by DOB at least three times before the fall of 2018.

**B.     High Ranking Politicians Ensured The Hotel's Permit Application Was Scrutinized By DOB.**

73.     In addition to filing their own lawsuit against the new owner and HPD arising from their objections to aspects of the Redevelopment, the Hotel's tenants enlisted a host of New York City's leading political figures to ensure that DOB thoroughly scrutinized the permit application before the Permit was issued.

74.     As the plan examination process wore on, major political players in the City were drawn into the tenants' concerns during the Redevelopment, prolonging the effort.

75.     For example, on April 5, 2012, a letter was sent to the DOB Commissioner thanking him for auditing all permits related to the Redevelopment.  It was signed by a host of important political figures including:

    (i)       NYC Council Speaker Christine Quinn;

    (ii)      Congressman Jerrold Nadler;

    (iii)    Manhattan Borough President Scott Stringer;

    (iv)    State Senator Tom Duane; and

    (v)     Assembly Member Richard Gottfried.

April 5, 2012

Hon. Robert LiMandri
Commissioner
Department of Buildings
280 Broadway, 7th Floor
New York, NY 10007

RE: Chelsea Hotel, 222 West 23rd Street, New York, NY 10011

Dear Commissioner LiMandri:

Thank you for auditing the permits associated with the Chelsea Hotel.  Such oversight is essential to ensure that the work conducted at this building complies with all regulations and is safe for the building's remaining tenants.  As the New York City Department of Buildings (DOB) conducts this audit, we wish to call attention to a number of issues related to permits associated with job numbers 120853754, 129073642, 120801123, 120929406 and 120972297.  These include: a possible inaccurate characterization of the zoned Floor Area Ratio (FAR), changes in egress, asbestos abatement requirements which may not be met, and inadequate maintenance of gas lines in the unoccupied units.

Thank you for taking the time to review this important matter. We ask DOB to notify us of any changes to the permits after the audit. Should you have any questions, please contact Jose Conde at Speaker Quinn's District Office at 212-564-7757.

Sincerely,

Christine C. Quinn
NYC Council Speaker

Jerrold Nadler
Member of Congress

Scott M. Stringer
Manhattan Borough President

Thomas K. Duane
State Senator

Richard N. Gottfried
Assembly Member

*Excerpts of letter dated April 5, 2012 to the DOB commissioner from*
*Christine Quinn, Jerrold Nadler, Scott Stringer, Tom Duane, and Richard Gottfried.*

76.    This letter, sent in the midst of the plan examination process, highlighted the sensitivity of the Hotel's application for DOB's highest-ranking officials, ensuring that it received thorough scrutiny.

77.     The letter to DOB's Commissioner raised a host of issues with respect to tenant safety, but did not suggest a Certificate of No Harassment was required.  Indeed, a record exists that during this time, DOB considered and dismissed the question of whether a Certificate of No Harassment was required, specifically on the basis that the building was not a SROMD.  As memorialized by SRO tenant Debbie Martin:



| From: | sr1912@gmail.com |
| Sent: | Wednesday, June 05, 2019 10:40 AM |
| To: | Hernandez, Elizabeth (HPD) |
| Cc: | Donaldson, Guy (HPD); Joseph, Ronit  (HPD) |
| Subject: | Re: 3rd Request for information regarding a timeline - Chelsea Hotel |

I currently live in the Chelsea Hotel (222 West 23rd St., Manhattan). I am one of two remaining tenants with a bathroom on the hallway and no kitchen. When construction/demolition started in my building in 2011 there were SRO tenants on every floor of the building and we wondered why the developers were not required to obtain a CONH.  We were told by DOB that the status of the Hotel had been changed and the building was not a SRO building so there was no need for the developer to obtain a CONH.

*Excerpt of June 5, 2019 email from Debbie Martin to Elizabeth Hernandez.*

78.     Thus, in 2011, during the plan examination process for the Permit, DOB confirmed that the Hotel was neither SRO-restricted, nor subject to the Certificate of No Harassment regime.

**IV.     The Owner Attempts To Advance The Redevelopment.**

        **A.     The Owner Invests Hundreds Of Millions Of Dollars In The Hotel.**

79.     The Owner's principals took over in March of 2016 and closed the purchase transaction in November 2016.  All told, the Owner has invested hundreds of millions of dollars in the Redevelopment.

80.     Although the Redevelopment effort started under Chelsea Dynasty, other than demolition of unoccupied rooms, Chelsea Dynasty had completed very little of the Redevelopment

work.  The Owner obtained a construction loan and used its proceeds to undertake major work including but not limited to:

     (i)     A third ADA compliant elevator;

     (ii)     A new ADA compliant stairwell on the east side of the Hotel;

     (iii)     A temporary lobby;

     (iv)     Overhaul and update of main lobby;

     (v)     Raising and fully replacing the two main legacy elevators, making them ADA compliant;

     (vi)     Adding risers throughout the building to upgrade HVAC, plumbing, electrical, and fire safety systems, connecting them to new mechanicals on the roof; and

     (vii)     Reconfiguring the floor plan to accommodate new transient hotel rooms and apartments.

81.    In addition, the Owner renovated occupied tenant apartments in accordance with the First Consent Decree, provided temporary accommodations for tenants as necessary for or desired by tenants, and framed out, and nearly finished, interior work on many of the 125 new hotel rooms being built into the open space left by Chelsea Dynasty's demolition work.

82.    In total, the Owner invested more than $200 million in the Hotel between 2016 and 2018.  All of this work was done in accordance with the Permit first obtained in 2012.

**B.**    **The Owner Mitigates The Impact Of The Construction On Tenants.**

83.    After taking over management, the Owner honored the rent abatements set forth in the First and Second Consent Decrees.  It settled a laundry list of outstanding rent disputes with tenants, many of whom had not participated in those settlements, and extended the rent abatement to many tenants who were not previously receiving those abatements.

84.    Over the period of 2016-2018, the relationship between Hotel management and most of the approximately 48 remaining tenants improved dramatically.  Mr. Drukier and Mr.

30

MacPherson each had offices on the first floor of the Hotel, keeping an open line of communication about the Redevelopment.

85.     During this time, the Owner also made extensive efforts to quickly resolve issues that arose, providing tenants direct access to a competent, responsive building manager who worked with an engineer to address plumbing issues, a team of porters to clean hallways, and a roofing company to address leaks.  When tenants felt conditions were too disruptive, the Owner offered to temporarily relocate them, all expenses paid.

86.     Despite efforts to work constructively with all tenants, a small group—Drew Straub, Rita Barros, Gretchen Carlson and Philip Taaffe, led by Jonathan and Susan Berg, and Debbie Martin and her husband, Ed Hamilton, and all advised by contingency attorneys Leon Behar and Mitchell Heaney (collectively, the "Complaining Tenants")—remained recalcitrant. They elected to reject offers to mitigate and resolve construction conditions, and instead raised an overwhelming number of complaints with City agencies and City politicians, almost always explicitly claiming "HARASSMENT!," even over the most mild inconveniences, despite the fact that they received a 35% rent abatement each month.

### C.     City Agencies' Constant Oversight Of The Redevelopment.

87.     Because of the Complaining Tenants' chronic calls to the City, particularly through 311, various agencies including HPD, DOB, and the Department of Health ("DOH") were routinely at the Hotel, often daily.

88.     The vast majority of 311 complaints received during this period were made by the Complaining Tenants.  By way of example only, HPD's 311 call logs between 2016 and 2019 reveal that over 250 (non-anonymous) complaints were lodged by the Complaining Tenants, while fewer than 50 such complaints were made by all other tenants combined.  HPD came to the Hotel on a regular basis for inspections as a result of 311 calls.

89.     DOH also scrupulously monitored the Hotel, inspecting the Hotel's conditions and work practices relating to dust containment and clean-up 49 times over approximately two years. In the majority of these inspections, the inspector found no construction dust or debris and no violation of the health code.  If an inspector found any condition that needed remediation, it was addressed promptly.  These inspections, like the HPD inspections, were mainly the product of 311 calls from the Complaining Tenants.

90.     Finally, the Division of Housing and Community Renewal ("DHCR") oversaw a harassment action filed by Mr. Straub and Ms. Barros (two of the Complaining Tenants) raising various complaints, including construction dust and debris, leaks, water pressure and temperature, and reduced elevator service.  On May 25, 2016, DHCR held a conference attended by Mr. Straub and Ms. Barros as complainants and Ms. Berg as a witness for the tenants in order to explore if the case warranted a formal hearing.  DHCR decided it did not and terminated the action on August 3, 2016, based on its finding that the tenants' allegations did not constitute harassment.

91.     Revealing the true motive for filing the action—a monetary settlement, Straub wrote to the Hotel's building manager after the May conference that he was "incensed," having "received no word from Chelsea Dy-nasty's Attorney regarding an offer."

On Thu, Jul 7, 2016 at 2:30 PM, Drew B. Straub <drewbstraub@aol.com> wrote:

This constant harassment "due to Construction" can not be discounted.  On and on it goes, day after day, week after week, month after month, YEAR AFTER YEAR. I am incensed and have received no word from Chelsea Dy-nasty's Attorney regarding an offer, other than the one I have  already turned down IN WRITING, VIA CERTIFIED MAIL ,within the time frame of our DHCR conference. The Tenants have been held in disregard, and the conditions here are shameful.

*Excerpt of July 7, 2016 email from Drew Straub to the Hotel's building manager.*

32

92.     Many of the Complaining Tenants, in particular Ms. Martin and Ms. Berg, also were in frequent communication with NYC politicians to raise complaints about the Hotel, including sending complaints about conditions to, or copying, Jesse Bodine from the Manhattan Community Board 4.

93.     As a result of the Complaining Tenants, various city agencies and politicians were closely monitoring the Hotel and were aware at all times of the Redevelopment effort, that tenants were living in the building, and that a small group of them were searching for any way to be obstacles to the Redevelopment for the purpose of extracting an astronomical buy-out from the Owner.

94.     Moreover, there is no debate that the City understood the precise nature of the construction taking place at the Hotel since a tenant protection plan ("TPP") was on file with DOB. And, at the constant demand of Ms. Martin, the TPP was amended and audited multiple times by the Owner and approved by DOB.  TPPs reflect the state of the building and methods to be employed to protect occupants during construction, such as detailing dust containment protocols. TPPs must be approved by DOB.  The Owner went through numerous iterations of the TPP to keep it up-to-date with changes in the building, including changes to access by SRO tenants to community bathrooms at the Hotel.

**V.      In 2018, The Redevelopment Was Improperly Halted,
         And The Owner Deprived Of Its Due Process Rights,
         On The False Basis That It Needed A Certificate of No Harassment.**

      **A.      Martin And The Bergs Exploit A Floorplan Change
         And Debbie Rand's Retirement To Stop The Redevelopment.**

95.     By the summer of 2018, work on the Redevelopment included shifting the eighth floor community bathroom used by Ms. Martin to a different location, equal in distance from her SRO unit as the legacy eighth floor community bathroom.  (Ms. Martin had earlier rejected an

offer of an *en suite* bathroom connected to her apartment that would not have reduced, but rather increased, the square footage of her unit.)

96.     Six days after she learned that she would be getting access to a new community bathroom, Ms. Martin sent an intentionally misleading email to the Deputy Commissioner for Enforcement and Neighborhood Services at HPD.

**From:** sr1912@gmail.com [mailto:sr1912@gmail.com]
**Sent:** Monday, July 30, 2018 11:50 AM
**To:** Santiago, AnnMarie (HPD)
**Subject:** Question about CONH at the Chelsea Hotel

Hello Ms. Santiago,

I am an SRO tenant at the Chelsea Hotel, 222 West 23rd Street, NY NY.  The most recent DOB filing shows that the Hotel plans to demolish the bathroom I have used since 1997 which is located to the West of my apartment.  I am wondering why this demolition should be allowed when there is no CONH on file with HPD for the building.

I am one of two tenants who have bathrooms outside of their rooms.  The other tenant is two floors away on the 10th floor.  When the construction started in 2011 there were SRO tenants on every floor.  They have all either moved (evicted) or allowed the Hotel to building bathrooms inside of their already small rooms.

Thank you for your consideration.
Debbie Martin

*July 30, 2018 email from Debbie Martin to AnnMarie Santiago.*

97.     Ms. Martin's statement to HPD was highly misleading, omitted critical facts known to her, and baldly implied false facts, including specifically:

> (i)     Omitting that the Hotel was not a SRO building, as she had been duly informed by DOB in 2011, and therefore no Certificate of No Harassment was required for the proposed work.
>
> (ii)    Omitting that she had been given a replacement bathroom on the eighth floor, equidistant to her Unit as the legacy bathroom.
>
> (iii)   Falsely implying that she would be forced to use the other community bathroom "two floors away on the 10th floor" once her legacy bathroom was demolished.

(iv)    Falsely implying that SRO tenants had been improperly evicted or forced to accept reduced living space in order to have a bathroom inside their "already small" units.

A photograph of Ms. Martin's replacement bathroom is below:



*Ms. Martin's replacement bathroom.*
*Photograph courtesy of 6sqft.com,*
*(https://www.6sqft.com/my-220sqft-debbie-and-ed-hamilton-have-made-it-work-for-24-years-in-a-chelsea-hotel-sro/).*

98.    With this materially false and misleading communication, Ms. Martin successfully instigated a policy change at HPD and ignited a harassment inquiry wholly without legal basis, while the Owner remained in the dark about why it had lost its Permit until October 2020 when, months into a trial concerning whether the Owner had "harassed" these tenants, an OATH Judge finally forced HPD to produce some of the relevant correspondence excerpted below that it had intentionally withheld.[9]

---

[9]  "OATH" stands for NYC Office of Administrative Trials and Hearings.  OATH is the City's "Independent and Impartial Administrative Law Court."  OATH Judges oversee administrative trials and hearings arising from decisions made by various City agencies.

**B.     The City, Through Ms. Weithman, HPD,
And DOB, Makes A Policy Determination, Wholly
<u>Unsupported By Law, That The Hotel Should Be Redesignated.</u>**

99.     Upon receiving Ms. Martin's email, HPD's Deputy Commissioner forwarded the

misleading missive to Ms. Weithman on July 31, 2018 asking:



**From:** Santiago, AnnMarie (HPD)
**Sent:** Tuesday, July 31, 2018 11:17 PM
**To:** Weithman, Marti (HPD)
**Subject:** FW: Question about CONH at the Chelsea Hotel

Hi, Marti.  Can you follow up with this tenant and let me know what action we might need to take here.  Thanks

*July 31, 2018 email from AnnMarie Santiago to Marti Weithman.*

100.     Whether Ms. Weithman actually followed up with Ms. Martin that day is unknown.

What is known is that Ms. Weithman did not look for the answer under the version of the law in

force at the time the Permit was obtained, nor did she act consistently with the City's past policy

or practice.  Rather, steeped in practical knowledge of the Certificate of No Harassment law, Ms.

Weithman carefully implemented a policy change to procure the reclassification of the Hotel's

SROMD status with DOB in order to force the Owner to apply for a Certificate of No Harassment

that she had every intention of denying.

101.     Ms. Weithman's first move in response to Ms. Martin's email was to ask her

subordinates a single question: "***Do we have a pending application for this building?***"

36

| | |
|---|---|
| From: | Weithman, Marti (HPD) <Weithmam@hpd.nyc.gov> |
| Sent: | Wednesday, August 1, 2018 9:41 AM |
| To: | Joseph, Ronit  (HPD); Waldon, Rhonda  (HPD) |
| Subject: | FW: Question about CONH at the Chelsea Hotel |

Do we have a pending application for this building? Thanks.

*August 1, 2018 email from Marti Weithman to Ronit Joseph and Rhonda Waldon.*

The answer plainly was, and should have been, no.  Consistent with the Luxury Exemption, as reflected on the DOB BIS system and in DOB's 2011 communication with Ms. Martin, the building's status was "SRO Restricted: No."  A building that is classified as "SRO Restricted: No" does not need to apply for a Certificate of No Harassment.

102.    Although Ms. Weithman reviewed DOB's BIS system and understood that in DOB's system the Hotel was "SRO Restricted: No," she elected not to take this information at face value.  Instead, she intentionally ignored the possibility that DOB's status may be correct.  For starters, she produced no record that she made an internal inquiry into whether an HPD exemption had been recognized.  If she had done so, she should have learned that, in fact, a Luxury Exemption had been recognized in 1997.

103.    Moreover, Ms. Weithman either failed to review or outright ignored the Consent Decrees signed by her predecessor Debbie Rand, which acknowledged the construction at the Hotel and nonetheless signed off on a deal between the tenants and the prior owners of the Hotel.  Such an act would have been entirely ultra vires on the part of Ms. Rand if a Certificate of No Harassment had been required.

104.	Finally, Ms. Weithman, again among the City's most sophisticated players as it relates to the complex Certificate of No Harassment regime, did not examine the law in place in 2012 when the Permit was issued.  Ms. Weithman did this intentionally because the 2014 law included a slight shift in the definition making any building that "contains" more than 9 class B units an SROMD (whereas the previous law required the units to actually be "used for" single room occupancy).

105.	Instead of observing the policy of her predecessor or publicly articulating a reasoned basis for departing from it, she surreptitiously emphasized the new language in the 2014 statute—without heeding any red flags that the Hotel's status in the DOB system was actually correct—to reverse its status based entirely on the fact that the certificate of occupancy showed that the Hotel "contains" more than 9 class B units.

106.	Under the prior version of the law, applicable at the time the Hotel obtained the Permit, if fewer than 9 class B units were being used for single room occupancy, the Hotel would not have been an SROMD required to obtain a Certificate of No Harassment.  Ms. Weithman and DOB improperly applied the 2014 law when, even without the Luxury Exemption, the Hotel might not have been an SROMD under the law in effect at the time the Permit was obtained.  Had Ms. Weithman applied the correct law, she would have needed to analyze whether the building had more than nine SRO units being used for single room occupancy when the Permit was issued in 2012, even if she believed the Hotel did not have a luxury exemption.  Ms. Weithman undertook no such investigation and when she approached DOB in 2018 had no idea how many units within the Hotel were used as required by the statute for the building to be a SROMD under the applicable law.

107.	In order to fully implement her policy change, Ms. Weithman induced DOB to re-designate the Hotel as an SROMD, selectively highlighting information that would lead DOB to

defer to HPD, instead of invoking a rigorous process and correct legal criteria on any change to the SRO status of the Hotel in order to protect the Owner's due process rights.  Consistent with her end goals, on August 2, 2018—two days after Ms. Weithman was informed of Ms. Martin's Certificate of No Harassment inquiry—Ms. Weithman sent an email to Andrew Wallace, Assistant General Counsel for DOB, reiterating several of Ms. Martin's provably false statements and selectively disclosing information about "HPD's" information about the building, all while purporting to innocently "inquire" about why a Certificate of No Harassment was not required:

**From:** Weithman, Marti (HPD)
**Sent:** Thursday, August 02, 2018 1:54 PM
**To:** Andrew Wallace (Buildings)
**Subject:** 216-234 West 23rd Street, MN
**Importance:** High

Hi Andrew,

I hope you're well. We received inquiry from a SRO tenant in the above-named address (Chelsea Hotel) about construction work happening in the building and the demolition of one or more common bathrooms. The tenant lives on the 8th floor where the owner plans to demolish the only common bathroom on the floor (there is also a common bathroom on the 10th floor where there is another SRO tenant – otherwise, I believe all of the units have internal bathrooms).

HPD has not received a CONH application so I'm wondering if you could look into the permits obtained and whether they cover the demolition of common bathrooms and advise as to why a CONH was not required. DOB's website shows that the building is not SRO restricted (http://a810-bisweb.nyc.gov/bisweb/PropertyProfileOverviewServlet?boro=1&houseno=216&street=west%2023%20street&requestid=0&s=A03C41B885B461E4F46BD08866A7430E), but HPD's information still shows 186 B units and there are still at least two SRO tenants living in the building who rely on the common bathrooms.

*Excerpt of August 2, 2018 email from Marti Weithman to Andrew Wallace.*

108.    Ms. Weithman's email—cleverly framed as a question—makes several false assertions, including that work "happening at the building" includes the demolition of the "only common bathroom" on the eighth floor.  If Ms. Weithman, or anyone at HPD or DOB had done the slightest due diligence at that time, they would have known that another full bathroom on the eighth floor was already available to Ms. Martin two weeks earlier (a fact Ms. Martin publicized with the website www.6sft.com six months later).  Moreover, in emphasizing that "HPD's

information still shows 186 B units," Ms. Weithman ignored not only its own 1997 Luxury Exemption (which HPD claims it did not maintain) but also the Consent Decrees signed by her immediate predecessor on behalf of Ms. Weithman's own office.

109.   Less than 10 days later, DOB's representative Andrew Wallace responded, agreeing that after a discussion with Manhattan Borough Commissioner Martin Rebholz **_"[p]er [Ms. Weithman's] email_**" DOB would change the status of the Hotel, with full knowledge that doing so would result in "**_audit objections and Stop Work Orders_**" for the long-running project.

**From:** Andrew Wallace (Buildings)
**Sent:** Friday, August 10, 2018 12:42 PM
**To:** Weithman, Marti (HPD)
**Cc:** Felicia Miller (Buildings); Martin Rebholz (Buildings); Benjamin Hillengas (Buildings); Joseph Bruno (Buildings)
**Subject:** RE: 216-234 West 23rd Street, MN

Marti:

I have discussed the SRO status of the captioned address - 216-234 West 23rd Street - with MN Borough Commissioner Martin Rebholz, who is cc'd here.  Per your email below, the SRO designation in BIS has been changed to YES for "SRO Restricted"

Please respond to all on this email that HPD confirms that the captioned address is an SRO Multiple Dwelling.

Following that, the Borough will proceed with audits for all active job applications at this address.  Following these audits, as required, Department will issue audit objections and Stop Work Orders.

*Excerpt of August 10, 2018 email from Andrew Wallace to Marti Weithman.*

Ms. Weithman immediately followed up to confirm for DOB in writing "**_that the [Hotel Chelsea] is an SRO multiple dwelling as per HPD's records_**, which indicate 85 A units and 186 B units in the building."

> **From:** Weithman, Marti (HPD)
> **Sent:** Friday, August 10, 2018 1:31 PM
> **To:** Andrew Wallace (Buildings)
> **Cc:** Felicia Miller (Buildings); Martin Rebholz (Buildings); Benjamin Hillengas (Buildings); Joseph Bruno (Buildings)
> **Subject:** RE: 216-234 West 23rd Street, MN
>
> Hi Andrew,
>
> I appreciate you all taking this prompt action with regards to the existing active job applications. I am confirming that the captioned address is an SRO multiple dwelling as per HPD's records, which indicate 85 A units and 186 B units in the building.

*August 10, 2018 email from Marti Weithman to Andrew Wallace.*

**C.    DOB Notices Its Intent To Revoke The
Permit And Refuses To Engage With The Owner's
<u>Management Until A Certificate of No Harassment Application Is Filed.</u>**

110.    As part of its fatal policy mistake in relying on "HPD's information" in changing the status of the building, on September 17, 2018, DOB issued a "Notice of Intent to Revoke Approval(s) and Permit(s)," notifying the Owner of its intent to revoke the Permit "***within fifteen calendar days of the posting of this letter by mail***," placing the burden of re-establishing that the Hotel is exempt for a second time on the Owner, twenty-one years after the Luxury Exemption was recognized by HPD.

**RE:   INTENT TO REVOKE APPROVAL(S) AND PERMIT(S)**
222 WEST 23RD STREET
Block: 00772  Lot:  00064
Application #: 120853754

Dear Sir or Madam:

The Department of Buildings (the "Department") intends to revoke the approval and permit issued in connection with the application referenced above, pursuant to Sections 28-104.2.10 and 28-105.10.1 of the Administrative Code of the City of New York ("AC"), within fifteen calendar days of the posting of this letter by mail unless sufficient information is presented to the Department to demonstrate that the approval and permit should not be revoked.

*Excerpt from DOB's September 17, 2018 Notice of Intent to Revoke Approval(s) and Permit(s).*

111.   The express language of the notice of intent leaves no room for doubt that DOB

deferred entirely to HPD in reclassifying the Hotel:

> "Department of Buildings ***has been informed by HPD*** that this building is SRO restricted and contains SRO dwelling units," and, thus a Certificate of No Harassment was required.[10]

---

[10] Specifically, the notice states that "[a]lteration applications for the subject building require submission of HPD3 form and potentially requires submission of an HPD Certificate of No Harassment . . . ." The HPD3 form is a form submitted to DOB when permits are sought for SROMDs.  The form includes a checklist to determine whether the type of work to be performed requires a Certificate of No Harassment.  Since the Permit is an Alt-1 permit that would require a Certificate of No Harassment if the Hotel were an SROMD, DOB's instruction to submit an HPD3 form was, in fact, an instruction to submit a Certificate of No Harassment.

> Department of Buildings has been informed by HPD that this building is SRO restricted and contains SRO dwelling units.
>
> Alteration applications for the subject building require submission of HPD3 form and potentially requires submission of an HPD Certificate of No Harassment per Rules of the City of NY section 28 RCNY 30-02.

*Excerpt from DOB's September 17, 2018 Notice of Intent to Revoke Approval(s) and Permit(s).*

112.    The basis upon which HPD arrived at the conclusion that led it to inform DOB about its decision was not disclosed.  No one called the Owner's principals or anyone else involved with the Redevelopment to explain this dramatic shift in policy six years into the project.  And as successors-in-interest without access to the Hotel's historical files that may have contained information on the Luxury Exemption or rent levels in 1983 (because of the dramatic split between Stanley Bard and his partners more than a decade earlier), the Owner had no effective means at hand to directly challenge the change and demonstrate, as it always suspected, that the building was luxury exempt.  All that the Owner's principals knew was that its Permit, which had been in place for six years, was being threatened and that the building had been reclassified as "SRO Restricted: Yes" as opposed to "SRO Restricted: No."

113.    Following through on its threat, on November 14, 2018, DOB issued a full stop work order, halting all work under the Permit.

114.    The only information available to the Owner during this time period was a single entry on DOB's BIS page for the Hotel from November 14, 2018:

| 11/14/2018 | A3 | FULL STOP WORK ORDER SERVED |
|---|---|---|
| | | BOROUGH COMMISSIONER HAS ISSUED STOP WORK ORDER FOR APPLICATION #120853754, FOR FAILURE TO COMPLY WITH THE PROVISION OF THE AC OR FALSE STATEMENT IN THE SUBMITTAL DOCUMENTS |

*The November 14, 2018 DOB BIS system's entry concerning the stop work order.*

115.    The Owner did not believe that the Hotel was an SROMD that required a Certificate of No Harassment.  Although the Owner attempted to confer with DOB, as the Owner would later be told, DOB was "working hand in glove" with HPD and would not even substantively discuss partially lifting the stop work order until after the Owner filed an application for a Certificate of No Harassment (whether it needed one or not; it did not).  After six months of effort to get a transparent answer about what caused the dramatic shift from the City, the Owner acquiesced and applied for a Certificate of No Harassment.  This decision was informed by the past experience of Mr. Drukier, Mr. Born and Mr. MacPherson.  They had applied for at least nine Certificates of No Harassment in connection with other projects, all of which been awarded within six to nine months—a perfect track record of non-harassment throughout their 30 years in business.

116.    Accordingly, on or about February 13, 2019, the Owner, through Mr. Drukier, filed an application for a Certificate of No Harassment—wherein he expressly stated that he believed that if the historical records were available they would show that the building was exempt— resulting in HPD's commencement of a harassment inquiry.

Based on the enduring status of Hotel Chelsea, we strongly believe that were the historic rental records available, the Hotel Chelsea would qualify for a luxury exemption from the CONH. Unfortunately, the statute calls for the production of records from the 1980's, which we have not yet been able to locate.

*Excerpt of the Owner's application for a Certificate of No Harassment, filed in February 2019.*

44

###### D.    HPD Conducts A One-Sided
###### Harassment Investigation Driven By The Complaining Tenants.

117.    Around April 16, 2019, HPD opened its harassment investigation at the Hotel.  The

harassment investigation of the Hotel—undergoing a complex redevelopment project overhauling

all major systems in an old, landmarked building that was halted mid-construction—was assigned

to Guy Donaldson, an inexperienced investigator who had worked for HPD's Certificate of No

Harassment unit for roughly seven months.  He had never investigated a property with as many

floors, as many units, and as many tenants as the Hotel.

118.    HPD's Certificate of No Harassment unit tapped Abimel Sequinot to "supervise"

Mr. Donaldson.  A longtime HPD Certificate of No Harassment investigator, close to the other

members of the tight-knit Certificate of No Harassment unit, who had a track record of lying to

get what he wants (Mr. Sequinot signed a confession of judgment acknowledging that he failed to

report his full household income to NYCHA in order to secure Section 8 Subsidy payments) was

directed to "supervise" Donaldson's investigation.

119.    Unbeknownst to Donaldson, members of the Certificate of No Harassment legal

team had been in close contact with the Complaining Tenants for almost a year—decidedly putting

their thumb on the scale—long before he launched his purportedly impartial investigation.  Those

Complaining Tenants had been carefully planning their attack for months—with the guidance and

support of members of the Certificate of No Harassment team—writing missives, assiduously

printing years of complaints (but none of the Hotel staff's responses), and amassing compendiums

of undated, un-contextualized photographs and uncorroborated handwritten charts of the

purportedly "harassing" conditions at the Hotel.

120.    Letters and phone calls from the Complaining Tenants came fast and furious to Mr.

Donaldson the moment he officially "opened" the investigation on April 22, 2019.  Gretchen

Carlson called Donaldson the day he opened the investigation.  Mr. Donaldson testified that he had no idea how Ms. Carlson got his telephone number.  It is not publicly available.  Likewise, Drew Straub sent Mr. Donaldson a lengthy letter.  Mr. Donaldson also testified that he had no idea how Mr. Straub got his email address.  It is not publicly available.  Ms. Berg started printing out emails to present to HPD as early as April 15, 2019, even though Mr. Donaldson did not even open his investigation until a week later.

121.    Moreover, on the day Mr. Donaldson opened the investigation, Ronit Joseph, a supervisor in HPD's Certificate of No Harassment unit, directed him to contact Ms. Martin and schedule his investigatory visit around Ms. Martin's schedule.  More specifically, Ms. Joseph expressly told Liz Hernandez, a Director of the Certificate of No Harassment unit, in an email chain copying Ms. Weithman and forwarded to Mr. Donaldson, to have Mr. Donaldson contact Ms. Martin "prior to the visit to set it up with her":



**From:** Joseph, Ronit (HPD)
**Sent:** Monday, April 22, 2019 10:04 AM
**To:** Hernandez, Elizabeth (HPD)
**Cc:** Weithman, Marti (HPD)
**Subject:** RE: Chelsea Hotel tenants still have not received notice of CONH application

Liz,
they should contact her prior to the visit to set it up with her.  You may want to inform her that they will attempt to reach her before visiting the building. We may have a telephone No. for Ms. Martin from prior emails, or they can contact her by email.

**From:**        Hernandez, Elizabeth (HPD)
**Sent:**        Monday, April 22, 2019 10:10 AM
**To:**          Donaldson, Guy (HPD)
**Subject:**     FW: Chelsea Hotel tenants still have not received notice of CONH application

Hi Guy,
Good morning! How are you?

Debbie Martin is a tenant at The Chelsea Hotel and she's looking forward to speak to someone about her experiences  and to perhaps send comments. When you go to the building, please reach out to her. Her contact info is below.

*April 22, 2019 email from Ronit Joseph to Elizabeth Hernandez, forwarded to Guy Donaldson.*

122.    Thus, the Complaining Tenants were aware that Mr. Donaldson would visit the Hotel on April 30, 2019.  This additional intelligence gave Ms. Martin time to choreograph Mr. Donaldson's visit to the Hotel.  Both Martin and the Bergs dotted the 'i's and cross the 't's on their lengthy "reports" to HPD (Ms. Martin's was 2 ½ inches thick), both of which are dated the day of Mr. Donaldson's visit.  Before Mr. Donaldson's arrival, the Bergs reached out to other tenants they thought they could manipulate into giving HPD negative feedback.  Gretchen Carlson—who had lived full time in Connecticut since 2014 and had not been seen in the Hotel at all in years—made the trip into New York City in order to be available to meet with Mr. Donaldson on the date of his visit to the Hotel.  No similar notice was given to the vast majority of tenants who support the Owner's principals and the Redevelopment.

123.    On April 30, 2019, Mr. Donaldson, accompanied by Mr. Sequinot, conducted his harassment investigation at the Hotel, led from place-to-place by Jonathan and Susan Berg whose gesturing hands appear in HPD's photographs from that day, many taken in areas in the Hotel off limits to tenants because they were under active construction and therefore unsafe.  Mr. Donaldson later drafted a report of this visit that was used by HPD to make its initial harassment determination.

124.    The statements upon which HPD ultimately relied from the Complaining Tenants were almost always hyperbolic, exceedingly exaggerated, misleading, or outright false.  As just a single example of the flagrant dishonesty evidenced by the Complaining Tenants during the investigation, one need look no further than the lengthy report submitted by Jonathan and Susan Berg.  In that April 30, 2019 letter, they accused the Owner's principals of lying in their Certificate of No Harassment application when stating that they "strongly believe that were the historic rental records available, the Hotel Chelsea would qualify for a luxury exemption from the [Certificate of No Harassment]," claiming that this statement was "false and misleading" because "[n]o

47

exemption applies" and the Owner's principals intentionally kept "DOB in the dark about the building being a single room occupancy multiple dwelling, for which a Certificate of No Harassment should have been applied for at HPD, but never was." Of course, as we now know, there was, as the Owner's principals believed, a Luxury Exemption obtained for the expansion of the Berg's own luxury penthouse.

Mr. and Mrs. Jonathan Berg
222 West 23rd Street, Apartment 1028
New York, NY 10011

April 30, 2019

Guy Donaldson
Investigator – Certificate of No Harassment Unit
Housing Litigation Division
100 Gold Street, 6th Floor, 6-Z2c
New York, NY 10038

Liz Hernandez
Director, Certificate of No Harassment Unit
NYC Department of Housing Preservation & Development
Housing Litigation Division
100 Gold Street, Room 6Z4
New York, NY 10038

RE:   Application for Certificate of No Harassment –
      216 West 23rd Street/222 West 23rd Street
      New York, NY 10011
      HPD Registration ID 131749  BIN1014130

Dear Mr. Donaldson and Ms. Hernandez:

2.   Drukier's claim that the building is exempted from having to get a CONH is likewise false:

Another misleading "fact" alleged by Mr. Drukier is also presented in his written statement annexed to the Application, after page 20. Therein, he claims that he "strongly believe[s] that were the historic rental records available, the Hotel Chelsea would qualify for a luxury exemption from the CONH." This too is a false and misleading statement by Drukier, since, commencing in 2007, he managed the building, and the construction there in, for the then-owner who had those rental records, and knew, as set forth in Drukier's counsel's letter above, that a CONH was required first in order to do any such work lawfully. No exemption applies, as Drukier is well aware. His false and misleading representation likewise requires that the Application be denied.

Omitted from this statement is Mr. Drukier's actual knowledge that the building had SRO tenants, and that he, like Chelsea Dynasty LLC, preferred to keep the DOB in the dark about the building being a single room occupancy multiple dwelling, for which a CONH should have been applied for at HPD, but never was.

*Excerpts from Jonathan and Susan Berg's April 30, 2019 letter to HPD officials.*

125.    Mr. Donaldson visited the Hotel again on May 8, 2019 and July 23, 2019, and continued to have communications with the tenants, as reflected in the report and closing memorandum.  Continuing to work in concert, Ms. Berg spoke with Mr. Donaldson during his July 23rd visit and escorted him to Ms. Martin's unit.

126.    Neither Mr. Donaldson nor anyone else at HPD made any attempt to fact check or verify statements made by tenants reflected in his report.  In contrast to time spent with tenants like the Bergs and Ms. Martin, Mr. Donaldson spent roughly 10 minutes speaking with the Owner's principals and had a brief conversation with the building manager, the only current employee of the Hotel interviewed.  A disgruntled former employee was interviewed, although no effort was made to understand why he was fired.  Positive information was omitted, including as one example only, an email from a tenant sent to Mr. Donaldson before his visit stating that "***No I do not feel I have been harassed by present management.  Those tactics ended quite some time ago with the departure of Mr. Chetrit*** and his management."

| | |
|---|---|
| From: | Raymond Foye <raymondfoye@gmail.com> |
| Sent: | Monday, April 29, 2019 3:37 PM |
| To: | Donaldson, Guy (HPD) |
| Subject: | from Chelsea Hotel Resident Apt. 814 |
| Attachments: | Zoe Letter Community Board 04-24-18.pdf; p 27 of 68_00243-_HLD_Zoe Letter Community Board 04-24-18.pdf |
| Follow Up Flag: | Follow up |
| Flag Status: | Flagged |

Dear Mr. Donaldson,

I would be happy to meet when you are int he hotel tomorrow, although I have a few appointments out during the day. Earlier would be better but you can also reach me at 917-459-3555 mobile.

No I do not feel I have been harassed by the present management. Those tactics ended quite some time ago with the departure of Mr Chetrit and his management.

*April 29, 2019 email from Raymond Foye to Guy Donaldson.*

Other information was included even though it concerned events outside of the relevant 3-year inquiry period. Further, Mr. Donaldson was largely unaware of rent abatements, relocation offers, and other efforts by the Owner's principals to mitigate the impact of the construction on tenants, even though he supposedly researched Hotel litigation as part of his report. The end result was a decisively one-sided report, painting an intentionally skewed portrait of life at the Hotel and the responsiveness of the Owner's principals to tenant concerns.

127. No attempt was made during the investigation to verify whether the Hotel was, in fact, an SROMD. Among other things, Mr. Donaldson made no attempt to determine the number of occupied SRO units in the building or even the number of total units in the building period, much less the number of units being used for single room occupancy in 2012 when the Permit was issued. Instead, like Ms. Weithman, Mr. Donaldson stopped at the recitation of B units in an HPD database to advance the investigation.

128. The fix was in. On August 9, 2019, HPD issued a determination that there is reasonable cause to believe that harassment occurred at the Hotel. On September 27, 2019, HPD filed its Petition against Mr. Drukier, as the Certificate of No Harassment applicant, seeking a hearing before NYC's Office of Administrative Trials and Hearings (the "OATH Proceeding") and a report and recommendation from the Administrative Law Judge presiding over that hearing that harassment occurred at the Hotel.

E. **The Tenants Seek To Leverage The Redesignation Of The Hotel Into A Pay Day.**

129. All along, HPD kept the Complaining Tenants apprised of the progress of the investigation, revealing to them that a determination had been made at or before the time the Owner was informed of the decision, even though they were not parties to the administrative proceeding.

Within days of having received the determination the Complaining Tenants' attorney demanded a paper copy of it from the Owner, purportedly as discovery in a parallel case filed on January 22, 2019 by the Complaining Tenants, alleging over and over again that the Hotel's Permit application failed to disclose that the Hotel was an SROMD and the Hotel required a Certificate of No Harassment before construction could continue (even though as we now know at least three of these tenants knew this was a false statement).   The attorney for the Complaining Tenants demanded $25 million from the Owner's principals, in exchange for these tenants not testifying for HPD in the OATH Proceeding that was looming on the horizon.   As the trial drew closer, the demand ballooned to $47 million, before the Owner ultimately cut-off any further discussions, walked away from the table, and set about defending itself against the bogus claims of harassment lodged against it.

      **F.**      **The Owner Uncovers The Luxury Exemption**
                    **During The OATH Proceeding, Leading HPD To Voluntarily**
                    **Withdraw The Action And DOB To Rescind The Stop Work Order.**

130.    Unfortunately, the OATH Judge rejected the Owner's motion to dismiss the proceeding on the basis that the First and Second Consent Decrees bound HPD to permit the construction to proceed.   Likewise, the administrative court put off ruling on the Owner's motion demanding that HPD produce its communications with DOB evidencing its hand in the Hotel's reclassification, until six months into the trial.

131.    The trial—which spanned 13 days between March 6 and November 4, 2020, not including countless off-the-record discovery conferences—was a brutal uphill battle.   HPD sought to exploit its home-field advantage at every turn.   The attorneys leading the case objected to virtually every exhibit the Owner proffered, tactically interrupted the Owner's cross-examinations and direct examinations with lengthy, often nonsensical, speaking objections, and beseeched the Court to exclude all evidence of any kind from prior to the inquiry period (three years before the

date of the application) which would all but ensure that the Owner would be unable to establish the propriety of the initial Permit.

132.    HPD called hardly any of the Complaining Tenants to testify as to the purportedly "harassing conditions" at the Hotel and did not seek to enter any of the reports those tenants authored about their experiences at the Hotel as evidence.  HPD closed its hopelessly weak case on harassment without submitting a scintilla of evidence that the Hotel was actually an SROMD on the date the Permit was issued in 2012.  Indeed, when the OATH Judge determined that he would allow the Owner to explore the question of whether HPD was required to prove that the Hotel was an SROMD under the law applicable in 2012 in order to prevail, HPD demanded (and was granted) the opportunity to re-open its case-in-chief.  Its proof about the building's status was a meandering affidavit from Ms. Martin about who lived in what SROs over the course of twenty plus years (which was unsurprisingly misleading in several respects).

133.    For the Owner's part, it was in the course of gathering documents for its expert witness on this topic that the Owner's expeditor stumbled upon the Luxury Exemption in the microfiche files in DOB's basement, just days before the trial was set to resume in January of 2021.

134.    Within a day of identifying the Luxury Exemption, DOB responded to an inquiry concerning the building's status for the first time in years—several prior explicit attempts to engage with DOB were rebuffed on the basis of the ongoing OATH Proceeding.  Although HPD initially fought the Luxury Exemption on the bad-faith, unlawful basis that it was a time-limited certification—it is not—HPD ultimately relented.

135.    After a conference with the OATH Judge, wherein HPD was warned that a decision might need to set forth the details of the Owner's expensive and time-consuming defense, HPD voluntarily withdrew the action on January 5, 2021, claiming that it had no record of the Luxury

Exemption anywhere in its files.  Two days later, DOB fully rescinded its stop work order, after more than two years.

## VI. The City's And The Tenants' Actions Cause Hundreds Of Millions Of Dollars In Damage To The Owner.

136.    The two-year delay in the Redevelopment project caused by the policy determination to redesignate the Hotel as SRO-restricted, issuance of the stop work order, and pursuit of the OATH Proceeding caused the Owner, Mr. Drukier, Mr. Born, and Mr. MacPherson extreme economic damage, reputational harm, and deprivation of their constitutional rights.

137.    DOB's policy of refusing to even partially lift the stop work order until the Owner filed for a Certificate of No Harassment caused cascading waterproofing problems along the north east of the building, largely sparing tenants, but destroying nearly finished hotel rooms.  The Owner's project timeline and anticipated opening of the Hotel to guests was delayed by years. Those delays caused the Owner damages in the form of increased cost of capital, extended carrying costs, and the complicated negotiations required to amend the financing arrangements.  Further, the Owner was forced to expend substantial costs and attorney's fees defending itself against HPD's bad faith pursuit of the OATH Proceeding.

138.    Moreover, for the principals of the Owner, the stop work order presented an existential crisis.  First, for the first time in their careers as developers and landlords, they were being dragged through the mud, wrongfully alleged to be attempting to constructively evict their tenants for their own profit.  Regarded as sophisticated investors, their reputations were sullied by the implication that they did not understand their own building's classification, or, worse, as the notation on the DOB website implied, had knowingly tried to pull a fast one on the City and tenants.  Second, they were obligated to redirect cash from other projects and investments, causing them to forego other lucrative opportunities.  Finally, because each of the principals had signed

personal guaranties on loans for the acquisition and renovation of the Hotel, the improper reclassification of the Hotel and its attendant consequences put them at risk not only of foreclosure of the asset, but also potentially personal bankruptcies.

139.   In total, the harm to the Owner and its principals arising from the deprivation of their due process rights is many millions of dollars.

## CAUSES OF ACTION

### COUNT I

**(Violation of Section 1983 Against the Defendants**

**– Unlawful Reversal of the Hotel's 1997 Luxury Exemption**

**and Redesignation of the Hotel as an SRO)**

140.   Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

141.   At all times alleged herein, Defendants were acting in concert and under the color of law.

142.   Defendants made policy determinations to re-designate the Hotel as SRO Restricted.

143.   These policy determinations, made by final policymakers, were the direct and proximate cause of the violation of Plaintiffs' constitutional substantive due process rights.

144.   The policy determinations were wholly without legal justification.  The 1997 Luxury Exemption provides the Hotel a permanent exemption from the Certificate of No Harassment requirements and establishes that the Hotel is not a SROMD.  As a result, there was no legal justification for Defendants to change the Hotel's designation to "SRO Restricted: Yes." Defendants failed to conduct any meaningful investigation prior to making these policy determinations and acted based on impermissible considerations.

145.    The policy determinations deprived Plaintiffs of their protectable property interest in the Permit and the Hotel.  Millions of dollars were spent on redeveloping the Hotel, owned by the Owner, under and in reasonable reliance upon the Permit, and Plaintiffs would have continued and completed the Redevelopment project under the Permit but for Defendants' violation of their constitutional substantive due process rights.

146.    Plaintiffs have suffered damages as a result of Defendants' violation of the Plaintiffs' constitutional substantive due process rights.

147.    Plaintiffs are entitled to damages in an amount not less than $100 million to be determined at trial, as well as costs and attorney's fees incurred in connection with this action under 42 U.S.C. § 1988.

## COUNT II

### (Violation of Section 1983 Against the City and DOB –

### Unlawful Stop Work Order and Reversal of Building Permit)

148.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

149.    At all times alleged herein, the City and DOB were acting under the color of law.

150.    The City and DOB made a policy determination to issue a stop work order for failure to obtain a Certificate of No Harassment.

151.    This policy determination, made by final policymakers, was the direct and proximate cause of the violation of Plaintiffs' constitutional substantive due process rights.

152.    The policy determination was wholly without legal justification.  The Luxury Exemption provides the Hotel a permanent exemption from the Certificate of No Harassment requirements and establishes that the Hotel is not a SROMD.  As a result, there was no legal justification for the City and DOB to issue the stop work order for failure to obtain a Certificate of

No Harassment. The City and DOB failed to conduct any meaningful investigation prior to making this policy determination and acted based on impermissible considerations.

153.    The policy determination deprived Plaintiffs of their protectable property interest in the Permit and the Hotel. Millions of dollars were spent on redeveloping the Hotel, owned by the Owner, under the Permit and Plaintiffs would have continued and completed the Redevelopment project under the Permit but for the City's and DOB's violation of their constitutional substantive due process rights.

154.    Plaintiffs have suffered damages as a result of the City's and DOB's violation of Plaintiffs' constitutional substantive due process rights.

155.    Plaintiffs are entitled to damages in an amount not less than $100 million to be determined at trial, as well as costs and attorney's fees incurred in connection with this action under 42 U.S.C. § 1988.

## COUNT III

**(Violation of Section 1983 Against the City, HPD and Weithman**

**– Unlawful Pursuit of the Certificate of No Harassment Legal Proceedings)**

156.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

157.    At all times alleged herein, the City, HPD and Weithman were acting in concert and under the color of law.

158.    The City, HPD and Weithman made a policy determination to pursue the OATH Proceeding.

159.    This policy determination, made by final policymakers, was the direct and proximate cause of the violation of Plaintiffs' constitutional substantive due process rights.

160.    The policy determination was wholly without legal justification. The Luxury Exemption provides the Hotel a permanent exemption from the Certificate of No Harassment

requirements and establishes that the Hotel is not a SROMD.  As a result, there was no legal justification for the City, HPD and Weithman to pursue the OATH Proceeding to determine whether a Certificate of No Harassment should issue.  The City, HPD and Weithman failed to conduct any meaningful investigation prior to making this policy determination and acted based on impermissible considerations.

161.    The policy determination deprived Plaintiffs of their protectable property interest in the Permit and the Hotel.  Millions of dollars were spent on redeveloping the Hotel, owned by the Owner, under the Permit and Plaintiffs would have continued and completed the Redevelopment project under the Permit but for the City's, HPD's and Weithman's violation of their constitutional substantive due process rights.

162.    Plaintiffs have suffered damages as a result of the City's, HPD's and Weithman's violation of Plaintiffs' constitutional substantive due process rights.

163.    Plaintiffs are entitled to damages in an amount not less than $100 million to be determined at trial, as well as costs and attorney's fees incurred in connection with this action under 42 U.S.C. § 1988.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants and in favor of Plaintiffs for the following relief:

1.    Damages in an amount not less than $100 million to be determined at trial;

2.    Prejudgment and post-judgment interest;

3.    Costs and attorney's fees incurred in connection with this action under 42 U.S.C. § 1988; and

4.    Such further and other relief as this Court deems just and proper.

Plaintiffs respectfully demand a trial by jury of all issues so triable.

Dated:  New York, New York
        May 4, 2021

                                                  KASOWITZ BENSON TORRES LLP

                                                  By: */s/ Jennifer S. Recine*
                                                     Jennifer S. Recine
                                                   Thomas Kelly
                                                     Gary W. Dunn
                                                     Jill L. Forster
                                                     1633 Broadway
                                                     New York, New York 10019
                                                     Tel.: (212) 506-1700
                                                     Fax: (212) 506-1800

                                                     *Attorneys for Plaintiffs*