**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X
                                    :

CHELSEA HOTEL OWNER LLC, IRA DRUKIER,    :
RICHARD BORN, and SEAN MACPHERSON,    :

                                      :    1:21-cv-03982(ALC)

            Plaintiffs,                :

                                      :    Hon. Andrew L. Carter, Jr.

     - against -                :

                                        :

CITY OF NEW YORK, NEW YORK CITY       :
DEPARTMENT OF HOUSING PRESERVATION &  :
DEVELOPMENT, MARTHA ANN WEITHMAN, in her :
official capacity as Assistant Commissioner of the New :
York City Department of Housing Preservation &  :
Development, and NEW YORK CITY DEPARTMENT OF :
BUILDINGS,                          :

                                      :

            Defendants.              :

                                      :

-----------------------------------------------------------------------X

 

**PLAINTIFFS' MEMORANDUM OF LAW IN**
**<u>OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND FACTS .....................................................................................................4

I.    The Hotel Chelsea ...................................................................................................4

II.   The Hotel Chelsea is not Subject to the CONH Regime ...................................5

III.  The Permit and the Redevelopment Project .......................................................7

IV.   The Redevelopment Project is Improperly Halted
      on the False Basis that the Owner Needs a CONH ............................................8

ARGUMENT .....................................................................................................................10

I.    The Complaint States Viable Claims for Violation
      of Plaintiffs' Constitutional Substantive Due Process Rights .........................11

      A.  Plaintiffs Have a Protectable Property Interest............................................11

      B.  Defendants' Conduct Was Wholly Without Legal Justification ...................16

      C.  The Complaint Adequately Alleges *Monell* Liability ..................................19

II.   The City Charter Does Not Preclude Suit Against Agency Employees.............21

CONCLUSION ..................................................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Artec Constr. & Dev. Corp. v. New York City Dep't of Hous. Pres. & Dev.*,
No. 15 CIV. 9494 (KPF), 2017 WL 782911 (S.D.N.Y. Feb. 27, 2017)................................21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................................10

*Cine SK8, Inc. v. Town of Henrietta*,
507 F.3d 778 (2d Cir. 2007) ................................................................................11, 18

*City of Cuyahoga Falls, Ohio v. Buckeye Cmty. Hope Found.*,
538 U.S. 188 (2003) .................................................................................................14

*Corbley v. Cty. of Suffolk*,
45 F. Supp. 3d 276 (E.D.N.Y. 2014) ......................................................................19

*Dosiak v. Town of Brookhaven*,
No. 16-cv-6658, 2017 WL 7048912 (E.D.N.Y. Nov. 27, 2017) .....................14, 19

*Frank Sloup and Crabs Unlimited, LLC v. Loeffler*,
745 F. Supp. 2d 115 (E.D.N.Y. 2010) ....................................................................11

*Harlen Assocs. v. Inc. Village of Mineola*,
273 F.3d 494 (2d Cir. 2001) ....................................................................................19

*Matter of Ken Mar Dev., Inc. v. Dep't of Public Works of the City of Saratoga Springs*,
53 A.D.3d 1020 (3d Dep't 2008)...................................................................16, 19, 20

*Monell v. Dep't of Social Servs. of City of New York*,
436 U.S. 658 (1978) .................................................................................................20

*Natale v. Town of Ridgefield*,
170 F.3d 258 (2d Cir. 1999) ....................................................................................19

*Nestle Waters N. Am., Inc. v. City of N.Y.*,
689 F. App'x 87 (2d Cir. 2017)...............................................................................19

*Pembaur v. Cincinnati*,
475 U.S. 469 (1986) .................................................................................................20

*Platt v. Michaan*,
459 F. Supp. 3d 553 (S.D.N.Y. 2020) .....................................................................10

*PMJ Cap. Corp. v. PAF Cap., LLC*,
    98 A.D.3d 429 (1st Dep't 2012) ........................................................................ 18

*Town of Orangetown v. Magee*,
    88 N.Y.2d 41 (N.Y. 1996) ......................................................................... *passim*

*Troy v. City of New York*,
    160 A.D.3d 410 (1st Dep't 2018) ....................................................................... 21

*Upstate Land & Props., LLC v. Town of Bethel*,
    74 A.D.3d 1450 (3d Dep't 2010) ................................................................. 11, 16

*Vecce v. Town of Babylon*,
    32 A.D.3d 1038 (2d Dep't 2006) ....................................................................... 11

*Villager Pond, Inc. v. Town of Darien*,
    56 F.3d 375 (2d Cir. 1995) ............................................................................... 10

*Walz v. Town of Smithtown*,
    46 F.3d 162 (2d Cir. 1995) ............................................................................... 18

*Yale Auto Parts, Inc. v. Johnson*,
    758 F.2d 54 (2d Cir. 1985) ............................................................................... 19

*Yuan v. Rivera*,
    48 F. Supp. 2d 335 (S.D.N.Y. 1999) ................................................................. 15

**Statutes**

42 U.S.C. § 1983 ...................................................................................... 11, 15, 20

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) ...................................................................................... 10

Plaintiffs Chelsea Hotel Owner LLC (the "Owner"), Ira Drukier, Richard Born, and Sean MacPherson (collectively, "Plaintiffs") respectfully submit this memorandum of law in opposition to the motion (the "Motion") of defendants City of New York (the "City"), the New York City Department of Housing Preservation & Development ("HPD"), Martha Ann Weithman in her official capacity as Assistant Commissioner of HPD ("Weithman"), and the New York City Department of Buildings ("DOB," together with the City, HPD, and Weithman, "Defendants") to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This case arises out of DOB's decision to stop all work on a massive redevelopment of the Hotel Chelsea—six years into the fully permitted project, which was repeatedly audited and inspected by numerous City agencies—because HPD told DOB to reclassify the building as a single room occupancy multiple dwelling ("SROMD"). HPD gave this incorrect (and unfounded) instruction, and DOB followed it, even though the Hotel already was correctly classified in DOB's official system as ***"SRO-NO"*** in accordance with a prior determination made by HPD that the building was "luxury exempt." In so doing, HPD unilaterally countermanded, without any court oversight, two Consent Decrees it had entered into expressly permitting the construction to proceed. It also ignored the definition of SROMD in effect at the relevant time period—when the permit was issued.

These arbitrary and irrational actions were taken by Defendants at the behest of a small group of disgruntled tenants seeking to block the redevelopment in order to extract a massive— "life changing"—payday from the Owner, and with the knowledge that the reclassification would freeze construction and force the Owner to apply for a Certificate of No Harrassment ("CONH") from HPD (a requirement specific to SROMDs). HPD intended to, and then did, deny the CONH application it intentionally induced. The Owner, in response, was faced with two equally

unacceptable options.  One, the Owner could settle (the only settlement on offer was accepting that the Owner had "harassed the tenants," in exchange for a slightly more limited period before it could reapply for a CONH).  Or two, the Owner could fight the allegations of harassment in an administrative forum under a law that dramatically favors tenants.  Either way, the redevelopment would be, and in fact was, left in limbo for years.  Hanging the Owner and the Hotel up in this manner was HPD's intended outcome—the new regime, led by Ms. Weithman, wanted to send the strongest possible pro-tenant message from the new guard at HPD to landlords throughout the City.  The Hotel Chelsea would be the trophy.

In pursuing this course of action, Defendants wrongfully stopped work on the Hotel for more than two years, without basis, depriving Plaintiffs of their most basic due process rights, caused tens of millions of dollars in damages, and harmed the reputation of the Owner's principals by dragging their names through the mud.  In a strikingly similar case, *Town of Orangetown v. Magee*, the New York Court of Appeals held a municipality liable for the violation of developers' substantive due process rights by improperly revoking a permit.   The developers had a protectable property interest in the permit—prong one of a substantive due process claim—because their rights vested after expending substantial sums to make substantial changes to the property.  The permit revocation was "wholly without legal justification"—prong two of a substantive due process claim—because the building inspector "exercised his legal authority [to revoke the permit] for political reasons at the direction of the Town Supervisor" after organized resistance to the construction developed within the community.

Here, the Complaint adequately alleges that Plaintiffs' rights in the permit vested after expending millions of dollars to upgrade every major system in the Hotel, renovate occupied rooms in cooperation with existing tenants, and frame out the 125 new Hotel rooms to be built in the open

space left by the demolition of aspects of the aging building.  Defendants attempt to redefine this protectable property interest in the permit as a mere economic right like a contract, a regulatory right, or a claim for malicious prosecution.  These arguments are meritless.

Equally meritless are Defendants' attempts to "reframe" the Complaint's allegations of the unjustified deprivation of those rights as the story of City agencies acting in good faith in response to tenant complaints, properly discharging their duties in reclassifying the Hotel because they innocently believed it was an SROMD, conducting a compulsory and even-handed investigation in response to Plaintiffs' application for a CONH, and denying the CONH and prosecuting an administrative proceeding based on the findings of an impartial investigation.  The Court is obligated to reject Defendants' explanation of the facts because it ignores, contradicts, or fails to contend with altogether, central allegations of the Complaint, which must be taken as true at this stage of the litigation.  When the Complaint's allegations are taken into account, the City's innocent explanation falls apart entirely.

The central allegation of the Complaint is that the City's agencies intentionally and without a valid basis (as the agencies were eventually forced to concede) reclassified the Hotel's status in the City's official records—the BIS system—where the actual classification of the building, ***SRO-NO*** was already properly recorded.  This wrongful and, as alleged, malicious and politically motivated act, was followed by a stop work order, a rigged investigation, the institution of a meritless administrative proceeding, and a corrupt, show trial, also all for political gain.  In the face of these allegations, it is cold comfort—***and the opposite of due process***—that there existed a mechanism pursuant to which the Owner had an opportunity to ***re-prove*** the status of the Hotel, which process required forty-year old documentation to which the Owner had no access.  The fact that the original luxury exemption happened to be in microfiche files in the bowels of DOB was a

fluke that no person or entity should need to rely upon to demonstrate the City's wrongful conduct in effectively tampering with its own official records without basis. In short, the Complaint's allegations are more than sufficient to state a claim for the violation of Plaintiffs' substantive due process rights. Accordingly, the Motion should be dismissed.

## BACKGROUND FACTS

### I.    The Hotel Chelsea

The Hotel Chelsea is among the most iconic New York buildings. ¶ 35.[1] A designated New York City landmark since 1966, it was added to the National Register of Historic Places in 1977. *Id.* The Hotel was one of the first cooperative apartment houses in New York City when completed in the early 1880's and later, following a brief closure, re-opened in 1905 as a luxury hotel. ¶¶ 36-37. Throughout its history, the Hotel has been a well-known haunt for an artistic clientele, with Mark Twain rumored to be an early guest, followed by a succession of poets, painters, musicians, photographers, and writers, including Sherwood Anderson, Jack Kerouac, William Burroughs, and Thomas Wolfe. ¶ 39.

In or around 1939, the Hotel was purchased by the Bard, Elder, and Krauss families. Thereafter, in or about the 1960s, Stanley Bard assumed management responsibility for the Hotel—a role he maintained until his ouster in 1997, when Bard lost control of the property to his partners. ¶ 38. Bard presided over the Hotel's most chaotic and infamous decades, during which time building maintenance was largely non-existent. ¶¶ 40-42. When Bard's partners seized control in the midst of a contentious legal battle, the Hotel was dilapidated, with every major building system in desperate need of repair, and the records of the Hotel in disarray. ¶¶ 43-44. Faced with a major, complex redevelopment project, Bard's partners decided to dispose of the

---

[1] Citations to "¶ __" are to the Complaint, ECF No. 1.

asset.  ¶ 44.

The Hotel was sold first to Chelsea Dynasty, LLC in 2011, and then to the Owner in 2016. *Id.*  Each of these subsequent owners worked to redevelop and modernize the Hotel by, among other things, maintaining occupied residential apartments; upgrading every major system of the Hotel; demolishing aging, unoccupied, transient Hotel rooms and apartments; and reconfiguring the vacant space left by the demolition into new transient hotel rooms and apartments (the "Redevelopment").  ¶¶ 44-46.  This work was done pursuant to a permit validly obtained in or about November of 2012 (the "Permit").  ¶ 72.

## II.    The Hotel Chelsea is not Subject to the CONH Regime

Single room occupancy units, or SROs, colloquially, are units with one or two rooms without a bathroom or kitchen; thus, SRO tenants typically share a common bathroom.  ¶ 48.  The Hotel presently contains only two such units, one on the eighth floor, occupied by Debbie Martin and Ed Hamilton, and another on the tenth floor, rented to Drew Straub.  *Id.*  Each SRO unit at the Hotel has access to a community bathroom on the same floor as the unit.  *Id.*

Attitudes towards, and governmental policies aimed at, SROs have changed over time, with the City banning construction of such units to discourage substandard SRO housing in 1954, then seeking to preserve SROs as "housing resources" for "generally poor and elderly" tenants by enacting the CONH regime in the 1980s.  ¶¶ 49-50.  The CONH regime is designed to protect these vulnerable poor and elderly tenants from abusive landlords, who might cut off essential services like heat or water, or otherwise threaten tenants, with the intention of getting them to vacate their units.  ¶ 51.

Under the law, if a building meets the definition of a single room occupancy multiple dwelling, or SROMD, its owners must apply to HPD for a CONH before getting an "Alt-1" permit

from DOB to move kitchens or bathrooms.  ¶¶ 51-52.  HPD decides whether to issue a CONH after investigating whether the owner has harassed its tenants.  ¶ 52.  Alternatively, if a building has been designated as an SROMD and the building does not, in fact, meet the definition of an SROMD, the owner can apply to HPD for an exemption, allowing the owner to pursue an Alt-1 permit without the need for a CONH.  ¶ 53.

Although the definition of SROMD has shifted over time, it always encompassed the idea that certain buildings with "Class B" units, or transient hotel rooms, could be SROMDs under some circumstances.  ¶ 54.  The definition, however, always explicitly excluded "luxury hotels," defined as buildings where the majority of rooms rented for amounts over certain dollar thresholds in May of 1983.  ¶ 55.  This luxury exemption, once granted, is permanent and not time limited.  ¶ 58.  Another exception in the definition prior to 2014 generally excluded buildings with fewer than nine "class B" units "used for single room occupancy."  ¶ 54.

In or about 1996, Jonathan and Susan Berg, tenants in the Hotel, signed a long-term lease with Stanley Bard and, with his express permission and assistance, sought to overhaul and expand their rented penthouse apartment.  ¶ 56.  DOB initially denied the permit for this project until the Bergs could resolve, among other things, the Hotel's obligation to obtain a CONH.  *Id.*  In lieu of a CONH, David Bard, Stanley's son, acting for the benefit of the Bergs and on behalf of the Hotel, obtained a permanent luxury exemption from the CONH requirement from HPD (the "Luxury Exemption").  ¶¶ 56-58.  As a matter of policy and practice, DOB tracks a building's "SROMD" status in its Building Information System or "BIS system," which has a public facing interface available on DOB's website.  ¶ 60.  In accordance with the Luxury Exemption, the Hotel's status on the BIS system was changed from SRO Restricted "Yes" to SRO Restricted "No" to reflect the accurate status of the building.  ¶ 63.

6

### III.    The Permit and the Redevelopment Project

When Chelsea Dynasty purchased the Hotel in 2011, it applied for an Alt-1 permit for the Redevelopment through a rigorous plan examination process whereby DOB reviews the plan for compliance with all of DOB's specifications.  ¶¶ 70-72.  After more than a year and ten rounds of objections and responses, DOB approved the Permit in late 2012.  ¶ 72.  Hotel tenants enlisted a host of the City's leading political figures to ensure the permit application was thoroughly scrutinized before issuance.  ¶¶ 73-77.  During this time, DOB considered and dismissed the question of whether a CONH was required on the basis that the Hotel was not a SROMD.  ¶ 77.

Thereafter, the Permit was renewed by DOB annually and audited by DOB on at least three occasions before the fall of 2018.  ¶ 72  Further, HPD twice expressly assented to and encouraged the Redevelopment through Consent Decrees agreed to in 2013 and 2016 by HPD's then-Assistant Commissioner for Litigation (the immediate predecessor to Ms. Weithman in that role).  ¶¶ 64-69.

When the Owner took over in 2016, little work had been done on the Redevelopment past demolition of unoccupied rooms.  ¶¶ 79-80.  The Owner set to work, investing hundreds of millions of dollars to overhaul all major systems, renovate occupied apartments, and frame out and nearly finish interior work on many of the 125 new hotel rooms being built in the open space left by the prior owner's demolition.  ¶¶ 79-82.  Despite the Owner's largely successful efforts to work constructively with the approximately 48 remaining tenants residing in the Hotel during the Redevelopment, a small group of vocal tenants advised by the same contingency attorneys (the "Complaining Tenants") elected to reject offers to mitigate and resolve construction conditions in favor of chronic calls complaining to City agencies and politicians over even the mildest inconvenience.  ¶¶ 83-86.  As a result, City agencies were routinely at the Hotel and monitoring the Redevelopment.  ¶¶ 87-94.

In sum, HPD granted the Hotel a permanent exemption from CONH requirements; DOB reflected that status in its BIS system; DOB determined that a CONH was not required during the extensive and much-scrutinized plan examination process; HPD twice assented to the Redevelopment without raising the issue of a CONH; and numerous City agencies monitoring the Redevelopment for years never raised the issue of a CONH.

## IV.    The Redevelopment Project is Improperly Halted on the False Basis that the Owner Needs a CONH

Nevertheless, in 2018, the Complaining Tenants decided to advance the false contention that construction could not continue without a CONH in the hopes of stopping construction to force a massive, unwarranted pay-day from the Owner.  ¶ 10.  To that end, Debbie Martin, one of two tenants in SRO units in the Hotel, sent an intentionally misleading email to HPD "innocently" inquiring why a CONH was not required given that the Owner was "demolishing" her hallway bathroom (omitting the fact that the Owner had already built a new bathroom equally close to her apartment).  ¶¶ 95-98.

In response, the new head of litigation at HPD, defendant Martha Ann Weithman, procured a change in the "SRO" status of the Hotel at DOB from "SRO: No" to "SRO: Yes."  ¶¶ 99-109.  In executing this policy decision, she failed to consider the applicable definition of SROMD in place when the permit was issued in 2012, ignored that her own agency had already exempted the Hotel from the CONH requirement as reflected on the DOB BIS system, and ignored that her office had executed the Consent Decrees twice assenting to the Redevelopment.  ¶¶ 102-106.[2]  To implement this policy change, Ms. Weithman induced DOB to re-designate the Hotel by sending

---

[2] Under the definition of SROMD in place at the time the Permit was issued, the Hotel may have qualified for the exemption for buildings that do not contain more than nine class B units used for single room occupancy, as well as for the luxury exemption it received.  ¶ 106.

an email asking about a CONH for the Redevelopment that selectively highlighted information that would lead DOB to defer to HPD's view of the Hotel's SROMD status. ¶¶ 107-108. Less than 10 days later, DOB agreed to change the status of the Hotel based on Ms. Weithman's email. ¶ 109. DOB then issued a notice of intent to revoke the Permit absent a CONH, followed by a stop work order, halting all work under the Permit. ¶¶ 110-13.

As HPD's policymakers fully understood, a change in DOB's system would stop the construction in its tracks and obligate the Hotel's Owner to apply for a CONH (unless it happened to have 40-year-old rent records sufficient to establish the Hotel was exempt from the requirement). ¶ 15. Every effort by the Owner to resolve the matter consensually with DOB and HPD, or even to understand how the building had come to be reclassified six years after DOB had issued the Permit, was met with a stone wall. ¶¶ 112-15. The Owner had no choice but to file an application for a CONH—in which it explicitly explained that it believed the Hotel was luxury exempt but, as a successor-in-interest, had no records. ¶¶ 115-16.

HPD's policymakers then, as planned all along, denied the CONH application they intentionally induced after a corrupt, "show" investigation engineered by HPD's litigation unit. ¶¶ 15, 117-28. HPD no doubt believed that the Owner would capitulate after HPD reached its "initial determination" that the Owner harassed tenants and settle or that HPD could easily win its claim in an administrative forum where HPD litigators frequently appear, under a law that favors tenants. ¶ 16. For the new guard at HPD, they no doubt believed this would send a strong pro-tenant message to landlords throughout the City. *Id.*

The trial dragged on for nine months as HPD litigators employed scorched-earth litigation tactics to bog things down and avoid the issue of how every City agency, including HPD, was aware of the construction since 2012, yet no one had thought to demand a CONH until 2018. ¶¶

9

20, 131-32. Indeed, HPD fought—and succeeded for many months—to avoid turning over the emails that would show how Ms. Martin got the attention of HPD, and HPD, in turn, leaned on DOB to change the status of the building in 2018. *Id.*

It was the production of these documents late in 2020 that caused the administrative law judge to finally accede to the Owner's repeated requests that it be permitted to put on evidence to show that HPD could not prove that the Hotel was an SROMD. ¶¶ 21, 132. In preparing its expert to testify on this subject, the Owner stumbled upon the Luxury Exemption in DOB's microfiche. ¶¶ 21, 133. Although HPD initially fought the Luxury Exemption on the bad-faith, unlawful basis that it was a time-limited certification—it is not—HPD ultimately relented and withdrew its case. ¶¶ 134-35. Two days later, DOB rescinded the stop work order. ¶ 135.

The two-year delay in the Redevelopment project caused by the policy determination to re-designate the Hotel as SRO-restricted, issuance of the stop work order, and pursuit of the administrative proceeding caused Plaintiffs extreme economic damage and reputational harm. ¶¶ 136-39.

## ARGUMENT

When deciding a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Platt v. Michaan*, 459 F. Supp. 3d 553, 558 (S.D.N.Y. 2020). To survive a motion to dismiss, the complaint need only "state a claim to relief that is plausible on its face" through factual allegations sufficient for "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The question on a motion to dismiss 'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Platt*, 459 F. Supp. 3d at 557-58; *see Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d

Cir. 1995).  As demonstrated below, Plaintiffs have more than adequately met this standard.

**I.**  **The Complaint States Viable Claims for Violation**
**of Plaintiffs' Constitutional Substantive Due Process Rights**

To state a claim pursuant to 42 U.S.C. § 1983 for the violation of substantive due process

rights, a defendant must allege "(1) the deprivation of a protectable property interest and (2) that

'the governmental action was wholly without legal justification.'"  *Upstate Land & Props., LLC*

*v. Town of Bethel*, 74 A.D.3d 1450, 1452 (3d Dep't 2010); *see also Town of Orangetown v. Magee*,

88 N.Y.2d 41, 52-53 (N.Y. 1996).  The second prong is sometimes referred to as government

action that is arbitrary, irrational or shocks the conscience.  *See Frank Sloup and Crabs Unlimited,*

*LLC v. Loeffler*, 745 F. Supp. 2d 115, 126 (E.D.N.Y. 2010).  Both prongs are sufficiently alleged

here.

**A.**     **Plaintiffs Have a Protectable Property Interest**

Plaintiffs' substantive due process claim is based on the violation of their protectable

property interest in the Hotel and the Permit for the Redevelopment.  Property rights in a permit

rise to the level of a fundamental right entitled to the protection of substantive due process where

"the [property owner] ha[s] made substantial improvements and incurred substantial expenses in

reliance on the issued permit . . . ."  *Vecce v. Town of Babylon,* 32 A.D.3d 1038, 1040 (2d Dep't

2006) (revocation of valid permit based on erroneous interpretation of the zoning code violated

substantive due process); *see Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 784 (2d Cir.

2007) (explaining that property rights in a permit are entitled to substantive due process protection

"when, pursuant to a legally issued permit, the landowner . . . effect[s] substantial changes and

incur[s] substantial expense to further the development").

For example, in *Town of Orangetown*, a protectable property interest in a permit existed

where the developers' "rights to develop their land had become vested" after expending substantial

11

sums to make substantial changes to the property. *Town of Orangetown*, 88 N.Y.2d at 52. Other factors supporting the determination that the developers' rights in the permit had vested were that "the limited future authorizations necessary to complete the project" "unquestionably would have [been] received" and there was a "very strong likelihood" the project would have been completed "absent the deprivation of due process." *Id.* at 52-53.

These same factors demonstrate that Plaintiffs have a protectable property interest in the Permit at issue here. The Permit was legally issued in or about November 2012 pursuant to a much-scrutinized, year-long plan examination process designed to ensure compliance with all of DOB's specifications. ¶¶ 19, 44, 71-72. From 2012 through 2018, the Permit was renewed by DOB annually and audited by DOB at least three times. ¶ 72. HPD also assented to and encouraged the Redevelopment by signing the Consent Decrees in 2013 and 2016. ¶¶ 64-69. Absent the wrongful re-designation of the Hotel as an SROMD, the Permit would have continued to be renewed until the Redevelopment was completed.

Furthermore, Plaintiffs' property rights in the Permit had vested because substantial sums were expended over the prior six years of the Redevelopment, with substantial demolition and renovations to the Hotel completed at the time the stop work order was issued. Plaintiffs invested more than $200 million in the Redevelopment between 2016 and 2018 alone. ¶ 82. Substantial work was done to update every major system in the Hotel; demolish aging, unoccupied rooms; renovate occupied rooms; and create new rooms in the empty space left by the demolition, framing out and nearly finishing interior work on many of the 125 new hotel rooms being built. ¶¶ 80-81. This work included: (i) building a third ADA compliant elevator; (ii) building a new ADA compliant stairwell on the east side of the Hotel; (iii) building a temporary lobby and completing an overhaul of the main lobby; (iv) raising and fully replacing the two main legacy elevators,

making them ADA compliant; (v) adding risers throughout the building to upgrade HVAC, plumbing, electrical, and fire safety systems, connecting them to new mechanicals on the roof; and (vi) reconfiguring the floor plan to accommodate new transient hotel rooms and apartments. ¶ 80.

Following this substantial investment in the Hotel, the stop work order was issued, halting all work on the Redevelopment for two years and leaving Plaintiffs and the Chelsea community in limbo. Based on the substantial costs spent on the Redevelopment, the substantial work completed, and the expectation that the Permit would continue to be renewed, Plaintiffs' rights in the Permit were vested rights entitled to substantive due process protection, just like the developers' rights in the permit in *Town of Orangetown*.[3]

Although Plaintiffs identified *Town of Orangetown* in response to Defendants' pre-motion to dismiss letter, *see* Letter, ECF No. 21, Defendants conspicuously ignore this case in their Motion. Instead, Defendants contend that no protectable property interest exists by attempting to redefine the property right at issue as "an economic right," "a regulatory right," or a claim for malicious prosecution. Br. 11-13. None of these attempts hold water, particularly in the face of directly on point case law holding that vested rights in permits are protectable property rights.

Specifically, for the first cause of action based on the unlawful reversal of the Hotel's 1997 Luxury Exemption and re-designation of the Hotel as an SROMD, Defendants contend that Plaintiffs' interest in the Luxury Exemption is "merely a regulatory right . . . to be exempt from the CONH Law," a right "analogous to an economic right." Br. 11-12 (citing *Local 342, Long Is. Pub. Serv. Empls. v. Town Bd. of Huntington*, 31 F.3d 1191, 1196 (2d Cir. 1991) (deprivation of

---

[3] Given that Plaintiffs' substantive due process claims are based on the well-established protectable property interest in permits recognized by the New York Court of Appeals in *Town of Orangetown*, Defendants' exhortations to the Court to exercise restraint when "defining or developing new rights," Br. 10, 13, are irrelevant.

contractual right to insurance payments not a protectable interest)).  An agency determination of the legal status of a building, which, in turn, directly impacts the owner's property rights, is hardly comparable to contractual or economic rights.[4]  In any event, this ignores Plaintiffs' protectable property interest in the Permit.

For the second cause of action based on the unlawful stop work order and reversal of the Permit, Defendants contend that "[t]he issuance of a SWO against a building permit . . . does not implicate any fundamental liberty interest."  Br. 12.  However, the only cases cited by Defendants address the second factor of substantive due process—whether the conduct shocks the conscience—not whether a protectable property right was at issue.  *See Dosiak v. Town of Brookhaven*, No. 16-cv-6658, 2017 WL 7048912, at *14 (E.D.N.Y. Nov. 27, 2017) (issuance of stop work order to protect against "potential damage to the environment" by alleged illegal dumping of solid waste does not shock the conscious absent "allegations to support an improper motive"); *City of Cuyahoga Falls, Ohio v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 198 (2003) ("[The] refusal to issue the permits while the petition [calling for the repeal of an ordinance authorizing construction] was pending in no sense constituted egregious or arbitrary government conduct.").[5]

---

[4] Defendants' claim that "[t]here was no 're-designation' of the hotel's status," Br. 12 n.6, is false. In 1997, HPD issued a permanent luxury exemption for the Hotel.  ¶ 2.  Thereafter, the Hotel was properly designated in DOB's BIS system, where exemptions are tracked, as "SRO: No."  ¶ 17. Consistent with this designation, HPD twice assented to the Redevelopment by signing the Consent Decrees.  ¶¶ 64-69.  Yet, instead of honoring that designation, HPD officials inveigled DOB to change the Hotel's designation to "SRO: Yes," apparently without conducting any investigation of its own files.  ¶ 18.

[5] Although Justice Scalia's concurrence in *City of Cuyahoga Falls, Ohio* (cited by Defendants) addresses property rights, the concurrence is equally inapposite because the case concerned a delay in receiving an initial permit.  *See id.* at 200-01.  By contrast, the permits at issue here and in *Town of Orangetown* had been validly issued, renewed, and relied upon in spending substantial sums to complete substantial construction.

Finally, for the third cause of action based on the unlawful pursuit of the CONH legal proceedings, Defendants contend this claim is, in essence, a claim for malicious prosecution, which is not actionable as a federal claim under Section 1983.  Br. 12-13 (citing *Singer v. Fulton Cty. Sherrif*, 63 F.3d 110, 114-17 (2d Cir. 1995) (dismissing Section 1983 claim premised on malicious prosecution for the alleged violation of the right to be free from suit absent probable cause)). However, Plaintiffs have not asserted a claim for malicious prosecution.  Instead, the Complaint alleges that Defendants violated Plaintiffs' protectable property rights in redeveloping the Hotel pursuant to the Permit by, among other things, pursuing an unlawful administrative proceeding. That Plaintiffs' property rights—not their right to be free from suit—were violated in the context of an administrative proceeding does not transform their substantive due process claim into a claim for malicious prosecution.  *Cf. Yuan v. Rivera*, 48 F. Supp. 2d 335, 340-42, 347 (S.D.N.Y. 1999) (allowing substantive due process claim based on deprivation of parental custody rights during Family Court proceedings to proceed).[6]

---

[6] Defendants also contend that Plaintiffs could have applied for an exemption (based on forty year old rent records they did not have), found the Luxury Exemption in the basement of DOB earlier, or challenged the stop work order by bringing an Article 78 proceeding.  Br. 13.  Defendants fail to explain what impact these contentions have on the existence of a protectable property interest and, based on the relevant factors of *Town of Orangetown*, it is clear these contentions are irrelevant. It would be strange indeed if victim blaming was sufficient to destroy property rights and excuse constitutional violations.

**B.      Defendants' Conduct Was Wholly Without Legal Justification**

The second prong of a substantive due process claim concerns whether the municipality's actions were wholly without legal justification, such as actions taken based on impermissible considerations that abuse governmental authority.  *See Upstate Land & Props.*, 74 A.D.3d at 1452. For example, in *Town of Orangetown*, a building inspector's revocation of a permit was wholly without legal justification because the inspector "exercised his legal authority for political reasons at the direction of the Town Supervisor" after organized resistance to the construction developed within the community.  *See Town of Orangetown*, 88 N.Y.2d at 53; *see also Upstate Land & Props., LLC*, 74 A.D.3d at 1453 (blanket denial of driveway permit due to complaints of neighbors and political pressure on the town board, rather than "permissible considerations pursuant to a specific application," violated substantive due process); *Matter of Ken Mar Dev., Inc. v. Dep't of Public Works of the City of Saratoga Springs*, 53 A.D.3d 1020, 1025 (3d Dep't 2008) (denying motion to dismiss substantive due process claim where official "unilaterally decided to prevent development" of real property regardless of the issuance of a building permit).

Here, HPD granted the Luxury Exemption and the Hotel's correct status as not an SROMD was reflected in DOB's official record system, the BIS system.  ¶¶ 17, 60-63.  HPD then re-designated the Hotel—in disregard of these records, the Consent Decrees whereby HPD had encouraged the Redevelopment, and the applicable definition of SROMD at the time the Permit was issued—at the insistence of a vocal minority of tenants and for political motivations to send a message to landlords.  ¶¶ 101–109.  DOB followed HPD's lead without any independent investigation and then stonewalled when Plaintiffs attempted to learn why its status had been changed several years after the Permit was issued.  ¶¶ 110–115.  HPD continued to conceal its misconduct by fighting in the administrative proceeding against production of key emails detailing

how the status of the Hotel was changed. ¶¶ 20, 98, 130. These outrageous actions, like the governmental actions in *Town of Orangetown*, were wholly without legal justification, shock the conscience, and state a claim for violation of substantive due process.

None of Defendants' four baseless contentions that its conduct does not shock the conscience compels a different result. <u>First</u>, Defendants contend that their "conduct does not shock the conscience because the City's alleged interferences with Plaintiffs' rights were brief," relying on a case concerning a four day long interference. Br. 14-15 (citing *Southerland v. City of N.Y.*, 680 F.3d 127, 153-54 (2d Cir. 2012) (affirming grant of summary judgment because removal of a child from their parent for no more than four days for the purpose of keeping the child safe does not violate substantive due process)). The two years long interference with Plaintiffs' rights is a far cry from four days.

 <u>Second</u>, Defendants contend that their "conduct does not shock the conscience because the City's alleged interferences with Plaintiffs' rights were . . . at worst, merely 'incorrect or ill-advised,' or 'arbitrary and capricious.'" Br. 14-15 (citing *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) (affirming grant of summary judgment because administrative confinement of inmate who had "created a threat to the security of the prison" did not violate substantive due process); *Kuck v. Danaher*, 600 F.3d 159, 167 (2d Cir. 2010) (requiring plaintiff to produce proof of citizenship or legal residency to renew permit to carry a firearm, even if not authorized, is "more routine than egregious" conduct and fails to state a substantive due process claim)). This is so, according to Defendants, because Plaintiffs did not locate or produce the Luxury Exemption prior to the end of 2020. Br. 15. DOB's and HPD's purported belief that Plaintiffs should have uncovered HPD's Luxury Exemption earlier, or proven its luxury exempt status twice based on forty year old rent records that it did not have, in no way legitimizes Defendants' decision to

17

disregard their own records of the Hotel's status in violation of Plaintiffs' substantive due process rights. Moreover, the Complaint alleges that Defendants' conduct was intentional and politically motivated, not merely incorrect. *See supra* p. 17.[7]

Third, Defendants contend their "conduct does not shock the conscience because it was reasonably taken to advance" the valid purpose of protecting "a vulnerable class of SRO tenants against landlord harassment." Br. 16 (citing *Sadowsky v. City of N.Y.*, 732 F.2d 312, 319 (2d Cir. 1984) (denying Fifth Amendment takings claim because, *inter alia*, requiring a CONH to convert SROs serves a valid purpose)); *see also* Br. 14 (citing *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 461-62 (2d Cir. 1996) (affirming grant of summary judgment because interference in parental rights in the upbringing of their children by a school district's mandatory community service program did not violate substantive due process)). However, the Hotel was not an SROMD subject to CONH requirements because, as HPD determined, it was luxury exempt. ¶¶ 2, 17–18, 56–63. Thus, Defendants' conduct was not taken for the valid purpose of protecting vulnerable SRO tenants. Rather, as alleged in paragraphs 99–109 of the Complaint, the City's unlawful decision to improperly re-designate the Hotel as an SROMD to force the Owner to apply for a CONH was made for political gain. *See Town of Orangetown*, 88 N.Y.2d at 53 (exercising legal authority for political reasons violates substantive due process); *cf. Walz v. Town of Smithtown*, 46 F.3d 162, 169 (2d Cir. 1995) (substantive due process violated because there is no legitimate state interest in requiring plaintiffs to convey a portion of their land in order to obtain an excavation permit).

---

[7] Defendants' motivations and the reasonableness of their actions present classic issues of fact that cannot be resolved on a motion to dismiss. *Cf. PMJ Cap. Corp. v. PAF Cap., LLC*, 98 A.D.3d 429, 431 (1st Dep't 2012) ("[D]efendant's words and deeds raise an issue of fact as to its intent, preventing dismissal of the complaint at this stage"); *Cine SK8, Inc.*, 507 F.3d at 790 (genuine issue of material fact over whether town board's actions were arbitrary or irrational precluded summary judgment on claim for substantive due process violation).

Finally, Defendants contend that because Plaintiffs could challenge arbitrary and capricious governmental conduct in an Article 78 proceeding, they cannot assert substantive due process claims. *See* Br. 17-18. As previously explained, the Complaint alleges more than arbitrary and capricious conduct by the City. In any event, the availability of an Article 78 proceeding in no way precludes a plaintiff from obtaining redress for the violation of its constitutional substantive due process rights. *See Town of Orangetown*, 88 N.Y.2d at 48, 53 (affirming judgment on both CPLR Article 78 and substantive due process claims); *Ken Mar Dev.*, 53 A.D.3d at 1023-25 (affirming, in part, grant of judgment in favor of petitioner on CPLR Article 78 petition and denial of motion to dismiss substantive due process claim). Unsurprisingly, none of the cases cited by Defendants hold otherwise.[8]

Accordingly, the Complaint adequately alleges the violation of Plaintiffs' substantive due process rights.[9]

## C.    The Complaint Adequately Alleges *Monell* Liability

Defendants contend that "[s]ince Plaintiffs fail to plead any plausible constitutional

---

[8] *See Natale v. Town of Ridgefield*, 170 F.3d 258, 268 (2d Cir. 1999) (jury charge should have explained plaintiffs could not prevail unless defendants' conduct "in denying the permits was so outrageously arbitrary as to constitute a gross abuse of governmental authority"); *Nestle Waters N. Am., Inc. v. City of N.Y.*, 689 F. App'x 87, 88 (2d Cir. 2017) (issuing jurisdictionally defective parking summons not outrageous conduct); *Yale Auto Parts, Inc. v. Johnson*, 758 F.2d 54, 60 (2d Cir. 1985) (no property interest entitled to due process protection where plaintiff failed to allege that but for governmental misconduct, it would have received the requested certificate); *Harlen Assocs. v. Inc. Village of Mineola*, 273 F.3d 494, 504 (2d Cir. 2001) (no property interest protected by substantive due process where issuance of permit was discretionary); *Dosiak*, 2017 WL 7048912, at *14 (issuance of stop work order to protect against "potential damage to the environment" by alleged illegal dumping of solid waste does not shock the conscious absent "allegations to support an improper motive"); *Corbley v. Cty. of Suffolk*, 45 F. Supp. 3d 276, 282-83 (E.D.N.Y. 2014) (property interest in vehicle not entitled to due process protection and decision to retain vehicle after plaintiff repeatedly drove while intoxicated was not outrageous).

[9] Defendants' contention that Plaintiffs were afforded procedural due process is irrelevant to whether Plaintiffs' substantive due process rights were violated. *See* Br. 18.

violation, there can be no municipal violation." Br. 18-19. This contention provides no basis for dismissal because, as demonstrated *supra* Sections I.A-B, the Complaint states claims for the violation of Plaintiffs' constitutional substantive due process rights. Defendants do not otherwise contend that the Complaint fails to allege municipal liability, nor could they.

A municipality is liable under Section 1983 for the deprivation of constitutionally protected rights where the injury arises from executing official policy. *See Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690-94 (1978). When the unconstitutional actions are taken by or at the direction of a municipal employee with final policymaking authority, those actions are "manifestations of official policy such that municipal liability under 42 USC § 1983 may lie." *Ken Mar Dev.*, 53 A.D.3d at 1024; *see also Pembaur v. Cincinnati*, 475 U.S. 469, 481 (1986) ("[W]here action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly.").

For example, in *Town of Orangetown*, the municipality was liable for the building inspector's revocation of the permit because the zoning code vested the inspector with the authority to revoke permits. *Town of Orangetown*, 88 N.Y.2d at 53; s*ee also Ken Mar Dev.*, 53 A.D.3d at 1023-1024 (holding municipality liable for actions directed by commissioner of public works that deprived petitioner of right to continue construction where commissioner "had final policymaking authority in at least some of the areas of governmental function associated with petitioner's development" of the property at issue).

The Complaint alleges that the conduct at issue—reclassifying the Hotel, issuing the stop work order, and improper pursuit of the administrative proceeding—was taken by final policymakers, the DOB Commissioner and HPD Assistant Commissioner Weithman. ¶¶ 99-128. Indeed, both the DOB Commissioner and Ms. Weithman appear on the City's official list of

"policy makers," which exists, in part, for the precise purpose of establishing *Monell* liability.  ¶¶ 64 n.8, 143, 151, 159.  Accordingly, the Complaint adequately alleges municipal liability.

## II.    The City Charter Does Not Preclude Suit Against Agency Employees

Defendants also contend that HPD, DOB, and Ms. Weithman in her official capacity (but not the City) "are not amenable to suit for monetary damages" under Section 396 of the City Charter.  *See* Br. 19.  This provision refers to agencies, not agency employees.  *See* City Charter § 396.  Cases cited by Defendants further confirm that Section 396 concerns agencies, not agency employees.  *See Artec Constr. & Dev. Corp. v. New York City Dep't of Hous. Pres. & Dev.*, No. 15 CIV. 9494 (KPF), 2017 WL 782911, at *4 (S.D.N.Y. Feb. 27, 2017) ("Defendants HPD and DOI are non-suable City ***agencies***") (emphasis added); *Troy v. City of New York*, 160 A.D.3d 410, 411 (1st Dep't 2018) (in action against police sergeant and police department, among others, holding that "defendant New York City Police Department should be dismissed from the action on the independent ground that it is a non-suable ***agency*** of the City") (emphasis added). Defendants do not cite any authority suggesting that a city employee is not a proper party to a suit for damages.  Accordingly, Ms. Weithman should remain in this action.

**CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.


Dated: New York, New York
       November 4, 2021

KASOWITZ BENSON TORRES LLP

By: /s/ Jennifer S. Recine
    Jennifer S. Recine
    Gary W. Dunn
    Jill L. Forster
    1633 Broadway
    New York, New York 10019
    Tel.: (212) 506-1700
    Fax: (212) 506-1800

*Attorneys for Plaintiffs*